**HONEYWELL INTERNATIONAL, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL–CIO, Intervenor.**

No. 00–1171.

United States Court of Appeals, District of Columbia Circuit.

Argued May 8, 2001.

Decided June 29, 2001.

Philip Allen Lacovara argued the cause for petitioner Honeywell International, Inc. With him on the briefs was Charles P. O'Connor.

Harold P. Coxson and Stanley R. Strauss were on the brief for amicus curiae Council on Labor Law Equality.

David A. Fleischer, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were John H. Ferguson, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. David S. Habenstreit, Attorney, entered an appearance.

Thomas W. Meiklejohn was on the brief for intervenor International Union, United Automobile, Aerospace & Agricultural Implement Workers of America.

Before: HARRY T. EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Honeywell International Inc. ("Honeywell") petitions for review from a decision of the National Labor Relations Board ("NLRB" or "Board") holding that the company violated §§ 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "Act") by unilaterally terminating severance benefits allegedly owed to bargaining unit employees. In 1994, Honeywell purchased Textron's military and commercial engine manufacturing operations at the Stratford Army Engine Plant in Stratford, Connecticut. At the time of the sale, Honeywell assumed the collective bargaining agreements that had been executed by Textron and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW" or "Union"), and its Local 376 and Local 1010. The collective bargaining arrangement consisted of a core agreement, a Competitiveness Agreement ("CA"), covering relocation decisions, and an Effects Bargaining Agreement ("EBA"), covering insurance, pension, severance, and other such benefits to deal with the economic impact and effects of a potential sale of Textron assets. At issue before us is whether the severance benefits under the EBA were subject to the rule enunciated in *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

Pursuant to *Katz*, it is generally held that, absent impasse or waiver, "an employer's unilateral change during the course of a collective bargaining relationship of a matter that is a mandatory subject of bargaining is a *per se* violation of the [NLRA]." THE DEVELOPING LABOR LAW 266–69 (Christopher T. Hexter et al., eds., 3d ed.1999 Cumulative Supplement). "The *Katz* doctrine has been extended as well to cases where, as here, an existing agreement has expired and negotiations on a new one have yet to be completed." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). Severance pay is indisputably a mandatory subject of bargaining; it was an established term of employment under the parties' EBA; and it is not among the categorical exceptions to the *Katz* rule noted in *Litton*. It is therefore clear that

Honeywell was barred from unilaterally terminating severance benefits at the expiration of the EBA, absent an impasse in bargaining with the Union or a waiver by the Union of the right to claim severance benefits on behalf of bargaining unit employees. The Board properly found no exception to the *Katz* rule in this case.

In challenging the Board's decision, Honeywell contends, first, that the "contract coverage" doctrine should trump the unilateral change doctrine in this case. In other words, Honeywell argues that, by the terms of the parties' agreement, severance benefits expired with the termination of the EBA. This argument fails, because severance benefits in the EBA are not limited to a time certain. The EBA contains a contract duration clause at the end of the document. Under *Katz*, however, an expiration date in a standard contract duration clause cannot defeat the unilateral change doctrine. Indeed, as the Court made clear in *Litton*, the *Katz* rule often presupposes the end of a collective bargaining agreement and guarantees the continuation of existing benefits *as a matter of law*. To hold that a general contract duration clause "covers" and vitiates a Union's *statutory* claim to continued status quo benefits, would be to drain the unilateral change doctrine of any coherent meaning.

Honeywell also claims that the express terms of the EBA clearly and unmistakably waived any right to post-expiration eligibility for severance. We agree with the Board that this argument fails. Honeywell's final argument, suggesting that this dispute should have been settled in arbitration, is foreclosed by 29 U.S.C. § 160(e).

Accordingly, we deny Honeywell's petition for review of the Board's order.

## I. BACKGROUND

In 1993, Honeywell, known at the time as Allied Signal, entered into negotiations to purchase Textron Inc., which produced mainly helicopter and tank engines for military and commercial purposes at the Stratford Army Engine Plant in Stratford, Connecticut. In 1994, Textron began negotiating new collective bargaining agreements with the UAW and its Local 376 and Local 1010. Although Textron owned the business at the time of the labor negotiations, Honeywell committed to adopting the agreements if they were competitive. *AlliedSignal Aerospace,* 330 N.L.R.B. No. 176 at 4 (Apr. 12, 2000).

After Honeywell and Textron announced the intended sale, the Union demanded to bargain over the effects on bargaining unit employees. Transcript (Oct. 6, 1998), *reprinted in* J.A. 98. Formal negotiations over the EBA took place between May 20 and July 13, 1994. During these negotiations, "the Union gave Textron an 'Effects Proposal' which included severance pay calculated on the basis of 40 hours of [pay] for each year of employment, with a graduated payment scale based on [an employee's] number of years of service."*AlliedSignal Aerospace,* at 4. The severance proposal was tied to a Supplementary Unemployment Benefit Plan ("SUB") that was in existence in the parties' expiring collective bargaining contract. *Id.* In the past, money in the SUB "had run out because of the large number of layoffs in 1991 and 1992. The union team was looking for an alternative to the SUB plan and thus [was] interested in working out a severance program." *Id.* at 5.

As a part of its Effects Proposal, the Union suggested that employees laid off because of the sale or laid off in the three-year period before the sale, and impacted by the sale, should be eligible for severance benefits. Effects Proposal (May 20,

1994), *reprinted in* J.A. 599–606. Textron responded on May 28 with a "declining balance" proposal. Under this plan, the employees laid off earliest would receive the greatest severance pay; the pay would gradually decrease over the period of the agreement, declining to zero benefits upon expiration of the EBA. *AlliedSignal Aerospace* at 5. This proposal also maintained a modified version of the SUB plan. Company Proposal (May 28, 1994), *reprinted in* J.A. 608–10. The employer's plan stipulated that only employees who had worked at least one year prior to the sale and who were laid off as a direct result of a transfer of bargaining unit work would be eligible for severance benefits. *Id.* at 609.

The Union rejected the company's proposal, because, under existing seniority rules, the most junior employees were laid off first and would therefore receive the most in severance benefits. *AlliedSignal Aerospace* at 5; Transcript (Oct. 6, 1998), *reprinted in* J.A. 150. However, the Union indicated that it was willing to adopt the eligibility criteria proposed by Textron. Employees on the active payroll with at least one year of employment at the time of purchase by Honeywell, and who were subsequently laid off as a direct result of a transfer of bargaining unit operations by the company, would be eligible for severance pay.

On June 2, Textron responded with a revised draft which retained the "declining balance" plan and included a duration clause stating that the EBA would "remain in effect until the date of expiration of the new 1994 labor agreement between the parties, but not thereafter unless renewed or extended in writing by the parties." *AlliedSignal Aerospace* at 5; Company Proposal (June 2, 1994), *reprinted in* J.A. 691–705. The Union rejected the duration clause. David Kelly, then president of Lo-

cal 1010, testified that the Union was concerned about employees laid off shortly before the EBA expired. Employees had to wait 12 months after being laid off to apply for severance benefits. Under the terms of the proposed duration clause, the Union was concerned that if an employee was laid off six months before the end of the agreement, the employee would not be able to apply for benefits. *AlliedSignal Aerospace* at 5–6; Transcript (Oct. 6, 1998), *reprinted in* J.A. 103.

Textron subsequently proposed the addition of the following language:

It is understood that expiration of this Agreement shall not foreclose the post-expiration payment to employees of bonuses or other benefits which accrued to them because of lay off during the term of this agreement, or the post-expiration presentation in a timely fashion of claims regarding matters arising out of the application of its terms prior to the expiration date.

*AlliedSignal Aerospace* at 6. The company also removed the declining balance provision, increased the severance benefit to 45 hours per year of service, and agreed that any employee with at least one year of seniority on the effective date of the agreement would be eligible for severance. *Id.* Final and Definitive Company Proposal (June 5, 1994), *reprinted in* J.A. 827.

The parties signed the EBA draft on June 9, 1994. This included an agreement by Local 1010 waiving its "right to bargain over any future work transfer, reduction in the working force (regardless of its scope), and any partial or total shutdown or closure of the Stratford Plant." *AlliedSignal Aerospace* at 6. The EBA also suspended the SUB fund during the term of the new agreement. *Id.* at 5 n. 9.

Subsequently, an internal company planning document dealing with plant relocation was leaked to the Union. The docu-

ment stated: "Best assumption today is that the Army will not buy any new tank engines. We need to evaluate the barriers to closing the plant in case that it eventually becomes expedient." *Id.* at 6; Internal Memorandum (June 6, 1994), *reprinted in* J.A. 204–07. When Union officials expressed concerns over the possibility of relocation, the parties negotiated the CA and revised the EBA, deleting the waiver provision. Transcript (Oct. 6, 1998), *reprinted in* J.A. 60–62. The final version of the EBA was signed by the company and Local 1010 on July 13 and ratified on July 21, 1994. Local 376 signed the EBA on July 28, 1994. In October 1994, Honeywell purchased Textron and assumed these agreements.

The eligibility portion of the severance provision in the EBA provides that:

... employees who are hereafter laid off shall be eligible for a severance bonus ... as specified in this Section....

An employee who shall be laid off without being recalled for a period of twelve (12) full consecutive months thereafter shall be entitled to a severance bonus if the employee was on the active payroll with one year or more of seniority on the effective date of this Agreement, or was on leave of absence granted or approved in accordance with the terms of the collective bargaining agreement on such date....

This severance bonus shall be payable to an otherwise eligible employee who is laid off after the effective date of this Agreement by either [Textron] or AlliedSignal [Honeywell], provided that an asset sale by [Textron] to such Allied-Signal shall, in fact, occur.

Effects Bargaining Agreement (July 13, 1994), *reprinted in* J.A. 512–13. There is nothing in the severance provision saying that severance benefits are terminated at the expiration of the EBA, or on any other

date for that matter. Rather, the severance provision merely states that an employee must have been "laid off without being recalled for a period of twelve (12) full consecutive months" and been "on the active payroll with one year or more of seniority on the effective date" of the EBA in order to be eligible for severance pay. *Id.*

The duration clause appearing at the end of the EBA specifies that the EBA expires on June 6, 1997, unless the agreement is renewed in writing. The EBA's duration clause reads as follows:

The Effects Bargaining Agreement shall be effective as of May 30, 1994, and shall remain in effect until midnight on June 6, 1997, but not thereafter unless renewed or extended in writing by the parties. It is understood that expiration of this Agreement shall not foreclose the postexpiration payment to employees of bonuses or other benefits which accrued to them because of layoff during the term of this Agreement, or the postexpiration presentation in a timely fashion of claims regarding matters arising out of the application of its terms prior to the expiration date.

*Id.* at 528. This clause mirrors the "June 6, 1997" expiration date in the parties' core collective bargaining agreement.

In September 1995, Honeywell announced that it intended to close the Stratford plant and terminate the CA. *Allied-Signal Aerospace* at 8. The Company was unclear, however, regarding whether employees would be paid severance benefits after the expiration of the EBA. For example, in January 1997, Honeywell wrote a letter to employees saying that "[q]uestions concerning layoffs after June 6, cannot be answered at this time, nor can we advise you of what benefits will be available after June 6. Benefits such as sever-

ance pay are subjects for negotiation." *Id.* at 9.

There is some dispute over when Honeywell first informed the Union that it intended to terminate severance benefits as of June 7, 1997. It is certain, however, that the Union had notice as of May 1997, when Allan Bocik, the company's vice president for labor relations, told Union officials that severance under the EBA would not continue after June 6, 1997.

The company informed the Union on June 13, 1997 that the decision to close the Stratford plant was final. Severance benefits were paid to employees who were laid off during the term of the EBA, but denied to employees laid off after June 6, 1997.

The Union filed a complaint with the NLRB alleging that the company violated §§ 8(a)(1) and (5) by unilaterally terminating severance benefits under the EBA. The ALJ determined that Honeywell had unilaterally changed the terms and conditions of employment in violation of § 8(a)(1) and (5) of the NLRA when it cut off severance benefits on June 7, 1997. With one member dissenting, the Board affirmed the ALJ's decision and held that Honeywell had a statutory obligation to maintain the status quo. The Board held that the contract coverage doctrine did not apply and that the Union had not waived any right to employees' post-expiration eligibility for severance pay.

## II. DISCUSSION

### A. Unilateral Change Doctrine

■ Under the NLRA, the obligation to bargain collectively includes the duty to "confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158 (d). In *Katz,* the Supreme Court held that a unilateral change by an employer during the course of a collective bargaining rela-

tionship concerning a matter which is a proper subject of bargaining is an unlawful refusal to bargain under the NLRA. Thus, an employer may not unilaterally alter a term or condition of employment unless the parties reach a new agreement or bargain to impasse.

The rationale for the *Katz* rule is simple:

A unilateral change not only violates the plain requirement that the parties bargain over "wages, hours, and other terms and conditions," but also injures the process of collective bargaining itself. "Such unilateral action minimizes the influence of organized bargaining. It interferes with the right of self-organization by emphasizing to the employees that there is no necessity for a collective bargaining agent."

*NLRB v. McClatchy Newspapers,* 964 F.2d 1153, 1162 (D.C.Cir.1992) (quoting *May Dep't Stores Co. v. NLRB,* 326 U.S. 376, 385, 66 S.Ct. 203, 90 L.Ed. 145 (1945)).

■ As noted above, the *Katz* rule applies in situations where "an existing agreement has expired and negotiations on a new one have yet to be completed." *Litton,* 501 U.S. at 198, 111 S.Ct. 2215. In other words, the unilateral change doctrine is premised on a *statutory* right. The right may be waived by contract and it may be vitiated if the parties reach an impasse in collective bargaining. And it applies only with respect to mandatory subjects of bargaining, excluding certain categorical exceptions recognized by the courts and the Board. *See, e.g., Litton,* 501 U.S. at 199–200, 111 S.Ct. 2215, *Acme Die Casting v. NLRB,* 93 F.3d 854, 857 (D.C.Cir.1996). Beyond these conditions, however, the *Katz* rule is an inviolate principle of collective bargaining.

■ The company does not dispute that severance pay is a mandatory subject of bargaining; nor does it dispute that sever-

ance pay was an established term or condition of employment under the EBA. The *Katz* rule barring unilateral changes therefore applies. The company had no right, even after the expiration of the EBA, to terminate or otherwise modify the severance provision absent an impasse in bargaining or a new agreement with the Union.

The company does not claim that it reached an impasse in negotiations over severance and it does not contend that the parties executed a new agreement to replace the EBA. Instead, the company claims (1) that the parties expressly agreed that the severance provision was to terminate with the expiration of the EBA, or (2) that the Union clearly and unmistakably waived any right of employees to claim postexpiration eligibility for severance pay. Bare nuances distinguish these arguments. The bottom line, however, is that both arguments are wrong.

### B. The Contract Coverage Doctrine

Honeywell argues that severance pay was "covered" by the EBA and, under the terms of the parties' agreement, it is clear that severance benefits terminate with the expiration of the EBA. Thus, according to Honeywell, the Board had no business interfering in the parties' dispute over the meaning of their contract. *See, e.g., NLRB v. U.S. Postal Service,* 8 F.3d 832, 837 (D.C.Cir.1993) ("where the employer acts pursuant to a claim of right under the parties' agreement, the resolution of the refusal to bargain charge rests on an interpretation of the contract at issue .... [n]ormally, under federal labor laws, arbitrators and the courts, rather than the Board, are the primary sources of contract interpretation").

█ There are two problems with Honeywell's argument. First, as discussed in part "D." below, the company never suggested to the Board that this case should have been resolved pursuant to a contractual grievance procedure. Therefore, "it is clear that, in this case, the Board had the authority to interpret the [EBA] to resolve the pending unfair labor practice charge." *Id.* Of course the courts remain "the ultimate arbiter[s] of contract disputes." *Id.* This is true because "defer[ring] to the Board's contract interpretation would risk the development of conflicting principles for interpreting collective bargaining agreements." *Id.* (citations omitted).

█ Second, and more importantly, the company is wrong in its claim that "[t]he status quo obligations of the Act did not apply to the EBA benefits," because "[t]he Unions had no right to the continuation of eligibility for those benefits after the termination date of the agreement." Petitioner's Br. at 32. To support this argument, the company contends that "[t]he Duration Clause [in the EBA] stated in the plainest terms both (1) the precise moment in time when the eligibility to qualify for EBA benefits would terminate and (2) precisely what would happen to benefit eligibility when the EBA expired." *Id.* at 37. As noted above, however, the disputed severance provision does not say that severance benefits are terminated at the expiration of the EBA. In fact, the severance provision does not tie benefits to dates certain, apart from saying that an employee must have been "laid off without being recalled for a period of twelve (12) full consecutive months" and been "on the active payroll with one year or more of seniority on the effective date" of the EBA in order to be eligible for severance pay. Effects Bargaining Agreement (July 13, 1994), *reprinted in* J.A. 512–13.

Honeywell's argument rests solely on the terms of the duration clause, not the severance provision. Under *Katz* and *Lit-*

*ton,* however, an expiration date in a standard contract duration clause without more, cannot defeat the unilateral change doctrine. As the Supreme Court made clear in *Litton,* the *Katz* rule often presupposes the end of a collective bargaining agreement, ensuring the continuation of existing benefits beyond the term of the agreement as a *matter of law.* We would effectively drain the unilateral change doctrine of any coherent meaning were we to hold that a general contract duration clause "covers" and thereby vitiates a Union's *statutory* claim to continued status quo benefits. We therefore reject Honeywell's construction of the *Katz* rule.

Honeywell suggests that this case is unusual, because, apart from its expiration date, the duration clause in the EBA also states that

> expiration of [the EBA] shall not foreclose the postexpiration payment to employees of bonuses or other benefits which accrued to them because of layoff during the term of this Agreement, or the post-expiration presentation in a timely fashion of claims regarding matters arising out of the application of its terms prior to the expiration date.

Effects Bargaining Agreement (July 13, 1994), *reprinted in* J.A. 528. According to Honeywell, this language conclusively proves that the severance benefit was limited: the Union insisted on the language, because the Union "necessarily understood" that eligibility for severance benefits terminated with the end of the EBA. Petitioner's Br. at 46. However, the cited language supports no such conclusion. Union official David Kelly testified that this language was prompted by the Union's concern that an employee could be laid off prior to June 6, 1997, but before the 12–month waiting period to apply for severance pay had passed, and the company could then "propose either the elimina-

tion or the reduction of those benefits." Transcript (Oct. 6, 1998), *reprinted in* J.A. 103. The Union insisted on these terms so that even after the EBA expired and the parties bargained to impasse, or reached a new agreement, employees laid off during the term of the EBA could continue to receive the severance benefits as defined under the EBA.

Honeywell is correct in asserting that, in order to be eligible for severance pay, an employee must be "laid off without being recalled for a period of twelve (12) full consecutive months" and have been "on the active payroll with one year or more of seniority on the effective date" of the EBA. Effects Bargaining Agreement (July 13, 1994), *reprinted in* J.A. 512–13. The company is wrong, however, in contending that eligibility could not be established after June 6, 1997. Under *Katz* and *Litton,* continuation of severance benefits was ensured absent an impasse in bargaining or a new agreement. In short, the company's claim that the duration clause of the EBA somehow superceded the unilateral change doctrine fails.

## C. Waiver

Honeywell's second principal argument is that the express terms of the EBA waived any employees' right to postexpiration eligibility for severance. We find no merit in this claim.

 There is no doubt that a union may waive its statutory protection against unilateral changes in mandatory subjects of bargaining. *Cauthorne Trucking,* 256 N.L.R.B. No. 115 (June 19, 1981), *enf'd in part,* 691 F.2d 1023 (D.C.Cir.1982). However, any such waiver must be "clear and unmistakable." *Metro. Edison v. NLRB,* 460 U.S. 693, 703, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983). On the record in this case, the Board correctly concluded that the Union did not clearly and unmistak-

ably waive its protection against post-expiration unilateral termination of severance benefits by the company.

In arguing for waiver, Honeywell points again to the duration clause, claiming that the express language of the clause shows that *"the parties decided to terminate eligibility for severance benefits at midnight on June 6, 1997, and to waive any statutory right to have eligibility continue indefinitely thereafter until another round of bargaining took place."* Petitioner's Br. at 45. If these words—which are found in the company's brief—had been included in the EBA, then Honeywell's waiver argument might have merit. But the aforecited words are not in the EBA. The language of the duration clause in the EBA makes it clear that the Union's *contractual* right to severance benefits ended on June 6, 1997; but the provision is silent on the Union's *statutory* rights under *Katz* and *Litton*. In other words, the duration clause in no way evinces a clear and unmistakable waiver by the Union.

Honeywell also argues that the parties' bargaining history demonstrates waiver. Honeywell originally offered a declining balance approach to calculating severance benefits. Under this approach, the severance paid to laid-off employees would have declined over the term of the contract, reaching zero when the contract expired. The Union rejected Honeywell's declining balance plan. Honeywell argues that the duration clause replaced the declining balance proposal and, as a result, acceptance of the duration clause reveals that the Union waived its rights to claim severance benefits after the EBA expired. This argument fails, just as Honeywell's claim that the duration clause itself constitutes waiver also fails. Acceptance of the duration clause, following the Union's rejection of the declining balance proposal, reveals only that the Union agreed that its *contractual* basis for receiving severance benefits would terminate on June 6, 1997. But this bargaining history does not demonstrate that the Union waived its *statutory* claims for protection from unilateral change in terms or conditions of employment following expiration of the contract.

Honeywell also points to some communications between the Union and its members, as if to suggest that the Union acknowledged that severance benefits ended with the termination of the EBA. For example, in a document written on July 21, 1994, the Union advised employees that "[t]he following benefits will be provided to all Local 1010 employees and retirees who are laid off during the agreement." Local 1010 UAW Decision & Effects Agreement, *reprinted in* J.A. 255. The statement is ambiguous regarding post-agreement lay-offs and does not prove that the Union intended to waive its statutory rights in signing the EBA. Furthermore, in the same document, in answer to the question "Who Can Get Severance Bonus?", the Union answered: "any employee with at least one year of service who is permanently laid off after the date of this agreement." *Id.* at 256. In short, there is no good evidence that the Union waived its claim to protection from unilateral change following termination of the EBA.

### D. Arbitration

In a final, futile gesture to save the day, Honeywell argued to this court that any dispute between the parties over the meaning of the severance provision and duration clause in the EBA should have been submitted to arbitration, not the NLRB. This is a specious claim.

Disputes that arise under a collective bargaining agreement can be arbitrated even after the contract itself has expired. *See Nolde Bros., Inc. v. Bakery Workers,* 430 U.S. 243, 97 S.Ct. 1067, 51

L.Ed.2d 300 (1977) (holding employees' claim for severance pay arose under the collective bargaining contract and was subject to arbitration terms even though it arose after the contract was terminated). Therefore, employees who were laid off before June 6, 1997, and who had grievances regarding their severance pay, arguably could have pursued those claims through arbitration even after the EBA was no longer in effect. However, the unilateral change doctrine does not apply to arbitration provisions in expired collective bargaining agreements: once the contractual basis for an arbitration agreement expires, the arbitration agreement expires. *Litton,* 501 U.S. at 210, 111 S.Ct. 2215. Parties are free to draft a contract agreeing to resolve postexpiration disputes through arbitration; absent such agreement, however, arbitration is not available. Thus, employees who were laid off after June 6, 1997—*i.e.,* the employees at issue in this case—could not have pursued arbitration to challenge the company's unilateral termination of severance benefits at the expiration of the EBA.

 Furthermore, the company's argument comes too late. Under § 10(e) of the NLRA, "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see, e.g., Quazite v. NLRB,* 87 F.3d 493, 497–98 (D.C.Cir.1996) (refusing to consider employer's argument that Board did not adequately explain need for bargaining order because employer did not raise objection before Board). Honeywell did not raise the availability of grievance procedures and arbitration before the Board and no "extraordinary circumstances" have been cited to excuse this

failure. Therefore, this court cannot consider the argument.

The company was silent on the subject of contractual grievance and arbitration procedures in the three documents submitted to the Board following the ALJ's ruling. Honeywell did not invoke the availability of grievance procedures or arbitration in its Exceptions of Respondent Allied Signal Inc. to the Decision of the Administrative Law Judge (No. 34–CA–7898–2), its Brief in Support of Exceptions of Respondent Allied Signal Inc. to the Decision of the Administrative Law Judge (No. 34–CA–7898–2), or its Reply Brief of Respondent Allied Signal Inc. (No. 34–CA–7898–2).

Before this court, the company did not refer to the availability of contractual grievance and arbitration procedures in its Preliminary Statement of Issues to be Raised. The matter was noted in passing in the company's initial brief to this court, where it was observed that "[d]isputes between employers and unions over the interpretation of contracts are matters for federal courts or, when the parties agree, by arbitration." Petitioner's Br. at 39. And, in its reply brief, the Company meekly suggested that, "[i]f there is a fair dispute about the meaning of a contract, with potential consequences that would survive the contract's expiration, nothing bars a court, acting under Section 301 of the Labor–Management Relations Act, 29 U.S.C. § 185 (1982), or a grievance arbitrator from interpreting the contract and providing relief to the wronged party." Petitioner's Reply Br. at 15. The company never contended that the Board *erred* in refusing deferral to arbitration. Even if we could tease such an argument out of the company's cryptic one-liners in its two briefs to the court, 29 U.S.C. § 160(e) bars us from considering the argument.

### III. Conclusion

For the foregoing reasons we deny the company's petition for review of the Board's order.