Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 24, 2003       Decided June 27, 2003

No. 01-1484

VICO PRODUCTS COMPANY, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW,
INTERVENOR

———

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

———

*Mark S. Ruderman* argued the cause and filed the briefs for petitioner.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Richard A. Cohen*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *David S. Habenstreit*, Supervisory Attorney.

*Catherine J. Trafton* argued the cause for intervenor. With her on the brief was *Michael B. Nicholson*.

Before: GINSBURG, *Chief Judge*, and SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Vico Products, Co., Inc. (Vico) petitions this Court for review of a decision and order of the National Labor Relations Board (Board) in an unfair labor practice proceeding against Vico. *Vico Prods. Co.*, 336 NLRB No. 45 (2001). The National Labor Relations Board seeks enforcement of its order. Vico argues that substantial evidence does not support the Board's findings that Vico had committed various unfair labor practices. Vico also argues that the Board's restoration order imposes an undue burden on it. Because there is substantial evidentiary support for the Board's findings, and because the remedial order is well within the Board's broad discretion, we deny the petition for review and grant the Board's cross-application for enforcement.

I

Vico is a family-owned company in the business of manufacturing and distributing parts used in the manufacture of automobile brakes. Robert Schultz is President and principal owner of Vico. Robert Schultz's son, Curt Schultz,[1] a 15 percent owner of Vico stock, manages the day-to-day operations of Vico as Vice President and General Manager. Since well before the relevant events, Vico owned an 83,000 square-

---

[1] Hereinafter, Curt Schultz will be identified simply as "Schultz," whereas Robert Schultz will be identified as "Robert Schultz."

foot manufacturing and distribution facility located in Plymouth, Michigan. In 1993, Vico opened a warehouse and distribution facility in South Carolina. At that location, Vico conducted some sorting functions that previously were located in Plymouth. Vico also relocated a chucker, which is used to perform a series of machining functions such as turning, boring, and/or threading, from Plymouth to South Carolina.

In 1994, Vico began manufacturing caliper pins, which are components of a disc brake assemblage. The production of caliper pins requires the use of large cold-forming machines ("headers") that cut and mold steel coil into rough-hewn parts that later go into the assembly of a larger finished part. After the cold-forming process, the rough-hewn parts are processed by finishing and fine-tooling machines. Next, the parts are sent to a company near Chicago for heat treatment and plating. Finally, the parts are returned to Vico for sorting, packaging, and shipment to customers.

By 1995, caliper pins became an important product line for Vico. At the time, Vico had only one caliper-pin customer, Bosch Manufacturing, which was located approximately 170 miles from Vico's Plymouth facility. Vico had numerous customers for its other products in the Louisville, Kentucky area. In the later part of 1995, a Louisville company (Ambrake) became Vico's second (and soon largest) customer for caliper pins.

On April 18, 1995, Vico applied through the Michigan Strategic Fund (MSF) for a $3,000,000 federally-guaranteed, low-interest loan to be used exclusively to upgrade the productive capacity of the Plymouth facility. The loan, by its terms, was to be used for the purchase of new machines and for renovating the Plymouth facility, including the "Blue Room," a 2300 square-foot room in the facility where the finishing operation for caliper pins was housed. Vico decided to use the Blue Room for production because it considered its facility "landlocked" – its property in Plymouth lacked any space into which Vico could expand its facility. In its application to the MSF, Vico specifically stated that "we are not considering an out-state/national location for this project."

The MSF issued tax-exempt development revenue bonds to Vico. Vico used these to secure a loan from a local bank. On March 1, 1996, Vico entered into a loan agreement, in which Vico committed to use the loan proceeds on the above "Project" and to keep the equipment purchased "at the Project Site" until the bonds underlying the loan reached maturity (10 years). Vico also stated that it expected to hire 10–15 new employees as a result of the planned upgrade. If Vico relocated the machines outside of the Plymouth facility before the bonds became due, it was obligated under the loan agreement to secure the lender bank's advance consent. If approved, Vico would then have to repay the portion of the loan equal to the cost of the relocated machines.

In December of 1995, Vico applied to Plymouth Township for a tax abatement with respect to its purchase of machinery with the loan proceeds. In its application, Vico stated that it would use the machinery within the town limits and that it anticipated hiring more employees for its caliper-pin line. The tax abatement was approved on January 29, 1997.

Vico made draws on the loan on March 1, 1996; May 13, 1996; December 30, 1996; February 27, 1997; and May 1, 1997. With each draw, Vico certified that the funds would be used to finance costs on the "Project." Vico took the first two draws to refurbish existing equipment and the remainder to purchase new equipment and convert the Blue Room into a caliper-pin production area. According to Vico's evidence, almost immediately after converting the Blue Room to production use, Vico experienced problems with its manufacturing process in that portion of the facility, due to its low ceiling and oily, pitched floor.

On May 10, 1996, Vico leased a 10,800 square-foot warehouse facility in the Louisville, Kentucky area (Louisville Building A). After taking possession of the warehouse facility, Vico moved some equipment to Louisville, including some cold-header machines and some sorting and assembly machines. Vico sent Ambrake an announcement, welcoming Ambrake to Vico's "Warehouse & Distribution Center." The announcement explained that Ambrake would be able to

operate with "reduced shipping cost and time" and with a "just in time" delivery system by which Ambrake could pick up products "daily or several times a day depending on the demand." The announcement did not mention the possibility of manufacturing caliper pins at that facility.

In June, Vico held a meeting with its employees at Plymouth, during which Schultz discussed Vico's plan to expand Plymouth's capacity to manufacture caliper pins. Schultz showed slides indicating that Vico's customer base was located mostly in the Louisville area. Schultz expected Vico to see growth for its products in that area. Schultz stated that Vico's future plans might include relocating part of the caliper-pin business to the Louisville warehouse and distribution center. In July, Vico distributed a newsletter to its employees in which it described the Louisville facility as a warehouse and distribution center. The newsletter made no mention of a relocation of the caliper-pin production.

In December of 1996, Schultz met with Ambrake President Richard Stephenson to discuss Vico's plans for the Louisville facility. At this meeting, Schultz may have mentioned to Stephenson the possibility of moving the caliper-pin operations to Louisville. (Schultz's testimony on this point is uncorroborated; the Board made no finding on this point.) In January of 1997, Schultz again met with Stephenson. Alyse Leslie, Quality Control and Shipping and Receiving Manager of Vico, attended the meeting as well. No mention of relocating the caliper-pin operations was made at the meeting. At this time, Leslie had no knowledge of the possibility of such a relocation. Some time after January, Vico began building up its inventory of caliper pins.

In February of 1997, a union organizing campaign began at the Plymouth facility. Several employees formed the UAW Volunteer Organizing Committee (VOC). On March 3, 1997, employee and VOC Chairman Jim White presented Schultz with a document signed by several employees that set out employee rights under the National Labor Relations Act (NLRA). Three days later, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of

America, AFL–CIO (Union) filed a representation petition with the National Labor Relations Board. On March 11, 1997, White gave Schultz a union document labeled "Sensible Rules for a Fair Election" that was signed by at least 50 employees. White asked Schultz to sign this document, but Schultz refused.

Some time in March, Robert Schultz approached employees Jacqueline Whitehead and Lucy Arnold and asked "Do you know what's going on around here?" After a response of "No," Robert Schultz stated that "if a Union gets out here, a lot of people could be laid off." He then put his hand on Whitehead's shoulder and stated, "If the Union gets in here, you can be laid off." Late in March of 1997, Company Comptroller and General Manager of Organizational Support Karen Dearing told a group of employees who had been discussing unionization that "changes . . . are going to be made when the Union is voted in and there may or may not be jobs left. Nothing is in stone, nothing is permanent." The Union won the Board election and was certified as the exclusive bargaining representative for the Plymouth employees.

In May of 1997, Union Representative Phillip Keeling contacted Vico and arranged a June 27 meeting with Schultz. In late May, Schultz informed Company Operations Manager Martin Cibich that he planned to move the caliper-pin finishing operations to Louisville over the July 4th holiday and instructed Cibich to arrange for a mover. Cibich met at the Louisville facility with Stephen Daugherty, the owner of an equipment moving company, to make arrangements for the move. They met at the plant on Sunday, June 8, 1997, when no employees were present. During their meeting, Daugherty noticed union materials and asked Cibich if there would be any labor problems with regard to the move, and Cibich replied that there would be none. Some time after this meeting, Daugherty informed Union Representative Keeling of the planned move.

On June 24, Schultz signed a one-year lease for a second, smaller facility in Louisville, which was to be used in the

manufacture of caliper-pins for Bosch (Louisville Building B). On June 25, in a meeting with members of the Union's bargaining committee, Keeling asked if anyone had heard of the possibility of equipment being relocated to Louisville. No one in attendance had heard of such a plan. At the June 27 meeting between Schultz and Keeling, Keeling asked Schultz if there was a move being planned. Schultz replied that relocation "may have to be considered in the future" but that there were "no immediate plans to move anything out of the plant." Keeling remarked to Schultz that if it came up, then Schultz should let Keeling know because the Union had a right to discuss the issue.

On July 2, 1997, Schultz informed Ambrake of the move. A few days later, Ambrake expressed concerns about the move in a letter to Vico. On July 3, 1997, Schultz announced the move to the employees. He explained that the caliper-pin finishing machines were being moved to Louisville over the weekend and that 33 unit employees were being laid off that day. Schultz added that applications would be accepted from anyone interested in applying for a job in Louisville. Schultz then faxed a letter to Keeling, notifying him of the move and the layoffs. Keeling responded by letter that day, expressing his disbelief that just six days earlier Schultz could have been unaware of the move when Keeling inquired whether a move was being planned.

On the morning of July 4, Cibich contacted Daugherty, but Daugherty was not ready to proceed with the move because he had not received a signed written proposal from Vico. Cibich contacted Thomas Rahburg, owner of another moving company, to arrange for the move. Rahburg agreed to handle the move. Shortly thereafter, Rahburg brought three flatbed trucks and two pickup trucks to the Plymouth facility. Several machines were loaded onto the trucks, and the trucks left the facility escorted by the Plymouth police.

On July 7, 1997, the machines were unloaded from the trucks and moved into the two Louisville facilities. Five of the machines were fitted with automatic feeds, including the Bosch machines that were placed in Louisville Building B.

The machines were arranged in triangular cells in order to permit them to be staffed by one, rather than three, employees. Vico staffed its Louisville facility in part with temporary employees.

During July, the parties began negotiating for a collective-bargaining agreement (CBA). In August of 1997, Vico declined to give its employees a wage increase as it had done the preceding 5 years (at rates of increase varying from 3–5%). Vico did not inform the Union of this decision nor engage in bargaining regarding the decision.

In September of 1997, the lender bank learned of Vico's move. By letter, the bank informed Vico that the bonds had to be redeemed to the value of the machinery moved out of state. On November 7, 1997, Vico redeemed $1.3 million of the bonds with funds borrowed from the bank.

In September of 1997, the Union filed unfair labor practice (ULP) charges against Vico. Administrative Law Judge Bruce D. Rosenstein (ALJ) conducted a hearing on the charges in March and May of 1998. On October 1, 1998, the ALJ issued a decision holding that Vico violated the National Labor Relations Act by failing to bargain with the Union over the relocation decision and the effects thereof and by failing to bargain over the decision to withhold an annual wage increase from employees in August of 1997. The ALJ dismissed the portion of the complaint which alleged that Vico's relocation decision was motivated by antiunion animus.

In the meantime, in December of 1997, after the ULP complaint had issued, the Board initiated a proceeding in district court in Michigan seeking as interim relief the return of relocated machines to the Plymouth facility. Vico settled that action by agreeing to return the Bosch machines from Louisville Building B back to the Plymouth facility. Instead of placing these machines back in the Blue Room, Vico placed these machines in a different part of the plant, where they were configured in a triangular cell arrangement similar to the way they had been configured in Louisville.

Both Vico and the Union filed exceptions to the ALJ's decision. On September 30, 2001, the Board issued a decision and order finding that Vico had violated section 8(a)(5) and (1) of the NLRA, 29 U.S.C. § 158(a)(5) & (1) (2000), by relocating its caliper-pin finishing operations to Louisville and laying off 33 employees in the process without affording the Union notice and an opportunity to bargain. Similarly, the Board found that Vico violated the same section of the NLRA by discontinuing its practice of annual wage increases without giving the Union notice and an opportunity to bargain. The Board also found (contrary to the ALJ) that Vico's relocation of its caliper-pin finishing operations and layoff of 33 employees were undertaken for antiunion reasons in violation of section 8(a)(3) and (1). 29 U.S.C. § 158(a)(3) & (1). The Board ordered Vico to cease and desist from the ULPs found. It ordered Vico to reestablish its caliper-pin operations in Plymouth and to offer the laid-off employees reinstatement to their previously held positions. In addition, the Board ordered Vico to make whole the laid-off employees for any losses incurred because of the ULPs. Finally, the order directed Vico to bargain to impasse and to post a remedial notice.

Vico filed a petition for review, arguing that the Board's findings were not supported by substantial evidence and that the Board's order imposed an undue burden on Vico. The Board filed a cross-petition for enforcement of its order, and the Union intervened in support of the Board's order.

## II

### A. Relocation Decision

#### 1. Failure to give notice and opportunity to bargain

Under *Dubuque Packing Co.*, 303 NLRB 386 (1991), the burden is on the Board's General Counsel to establish a *prima facie* case by demonstrating that the employer's relocation decision involved a relocation of unit work unaccompanied by a basic change in the nature of the employer's operation. *Id.* at 391. Such a demonstration establishes that the relocation decision is a mandatory subject of bargaining.

*Id.* The employer may then rebut the *prima facie* case by showing (1) that the work performed at the new location varies significantly from the work performed at the former location; (2) that the work performed at the former location is to be discontinued entirely and not moved to the new location; or (3) that the employer's decision involved a change in the scope and direction of the enterprise. *Id.* Alternatively, the employer may defend itself by showing that (1) labor costs (either direct or indirect) were not a factor in the decision; or (2) even if labor costs were a factor, the Union could not have offered labor cost concessions that would have resulted in the employer changing its decision. *Id.*

Vico does not dispute the fact that the relocation decision was a "relocation of unit work unaccompanied by a basic change in the nature of the employer's operations" and, therefore, a mandatory subject of bargaining. Vico thereby concedes that the General Counsel has satisfied the *prima facie* requirements as outlined in *Dubuque Packing*.

Vico attempts to defend its action by arguing that labor costs were not a factor, or to the extent they were a factor, that the Union could not have offered concessions sufficient to induce Vico to refrain from relocating. Vico contends that labor costs in Louisville were as high as or higher than labor costs in Plymouth. Vico explains that labor costs in Louisville included payment for temporary employees, which required payment to the temp agency over and above the actual wages paid to the temporary employees. Temporary employees in Louisville cost Vico $12.00/hour ($8.00 for the employee; $4.00 for the temp agency) whereas the laid-off employees cost Vico $8.85/hour. Vico argues that any difference in benefits between the two is offset by the fees to the temp agency.

Vico contends that it relocated not for reduced labor costs, but because relocation allowed for implementation of the cell configuration and automation of the machines, which reduced the number of steps in the manufacturing process, thereby reducing the total number of employees required in the manufacturing process. In addition, Vico contends that it

saved on freight charges and that relocation relieved it of its landlocked situation in Plymouth and its difficulties relating to the Blue Room.

Even assuming that labor costs were a factor, Vico argues that the Union could not have offered concessions sufficient to overcome the benefits of the relocation. Vico conducted a cost-benefit analysis based on confirmed orders that indicated that Vico's relocation would yield savings of approximately $240,000 in 1998 and $325,000 in 1999. Vico contends that spreading these savings over the number of employees would mean that the Union would have to offer concessions of $3.50 to $4.72/hour per laid off employee (using the 1998 and 1999 figures, respectively) or $.89 to $1.20/hour per employee overall. Further, Vico argues that it needed to utilize the Louisville facility in any event, at least to house new equipment and machinery because the Plymouth facility could hold no more equipment or machinery.

Vico's arguments fail. The evidence shows that Vico's decision was based on labor costs. Schultz testified that he believed that Vico could make caliper pins more cheaply in Louisville. More importantly, one of Vico's primary reasons for relocation – that relocation allowed for the implementation of cell configuration and automation of machines, thereby reducing the amount of labor – is in fact based on labor costs.

Similarly, Vico's contention that its savings were so substantial that the Union could not have made concessions fails. As the Board noted below, Vico's cost-benefit analysis of the relocation was performed after the fact and could not have formed the basis for Vico's decision to relocate. Further, Vico's analysis fails to account for efficiencies that would result if Vico implemented cell configuration and added automatic feeders to its machines in Plymouth (as it did in Louisville). Vico's later agreement to move certain machines back to Plymouth and its subsequent use of cell configurations there underscores the fact that utilization of the more efficient cell process was and is viable in Plymouth. Also, Vico's analysis fails to account for the potential increased efficiencies resulting from the build-up of inventory in Louis-

ville. As Vico's arguments fail, we see that substantial evidence supports the Board's finding that Vico failed to give the Union notice and an opportunity to bargain over the relocation decision.

2. Failure to engage in effects bargaining

Vico argues that the Board erred in ruling that Vico failed to negotiate with the Union over the impacts and effects of the relocation of Vico's caliper-pin production facility. Vico contends that at the time of the relocation, it offered to negotiate the effects of the relocation with the Union. The parties met for a bargaining session on July 21, 1997, during which Vico's counsel asked Union representatives whether they had any proposals relative to the "effects of the relocation." The Union representatives replied that they were unwilling to negotiate over the effects at that time and would only negotiate over the alleged outstanding ULPs. Later, at the hearing on March 4, 1998, counsel for the Union submitted a party admission acknowledging the Union made proposals regarding the decision to relocate and the effects of that decision. Further, the Union admitted that Vico made proposals on effects (two weeks salary to the laid-off employees and recall rights for those employees as well). The Union responded that they would consider the offer if it included a requirement that Vico enter into a CBA with the Union.

Vico's arguments miss the mark. As the Board has held, "pre-implementation notice is required to satisfy the obligation to bargain over the effects" of a decision that impacts conditions of employment. *Los Angeles Soap Co.*, 300 NLRB 289, 289 n. 1 (1990) (quoting *Metropolitan Teletronics Corp.*, 279 NLRB 957, 959 n. 14 (1986)). As Vico gave the Union no advance notice of the relocation plan and the 33 lay-offs, Vico denigrated the Union and the viability of the process of collective bargaining itself, in the eyes of unit employees. *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 125, 131 (D.C. Cir. 2001). Vico's after-the-fact offers to engage in effects bargaining are irrelevant because they cannot undo the damage already done to the Union and the process of collective bargaining.

B.  Discontinuation of Practice of Granting Annual Wage Increases

Vico makes two arguments to justify its failure to give the Union notice and an opportunity to bargain on the subject of annual wage increases. Vico first argues that the Union waived its right to bargain on this subject. Vico contends that the Union's failure to object to a statement in a letter from Mark Ruderman, an attorney for Vico, to UAW staff representative Phil Keeling constitutes a clear and unmistakable waiver. The relevant statement reads: "The parties agree to discuss language issues first and then economics as a total package." Letter from Ruderman to Keeling of 8/11/97, at 2. Vico notes that not only did the Union fail to object to this statement, but also Keeling failed to request past wage increase information from Vico or to discuss wage increases with employees until October of 1997. Vico contends that Keeling's nonfeasance lead to the Union's acquiescence in the terms of the above letter, waiving negotiations over the economics proposals until a later date.

Vico then compares this case to *Norris Indus.*, 231 NLRB 50 (1977). In that case, the employer proposed to terminate the medical group insurance of employees on medical leaves of absence and incorporated this proposal in a letter of understanding that was signed with a contract between the parties. The Board held that even though the Union underestimated the scope of the proposal, the letter constituted a waiver. Vico argues that here the letter defers negotiations on the amount of any wage increase pending discussions of the non-economic language.

Vico's waiver argument fails. The fatal defect in Vico's waiver argument is that the Union was unaware of the past practice of annual wage increases. The Board's "clear and unmistakable" rule as explained in *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 707–08 (1983), requires that for a waiver to have occurred, the subject in question must have been explored and the waiver expressed in unequivocal terms. *See Proctor Mfg. Corp.*, 131 NLRB 1166, 1169 (1961). The Union "cannot be held to have waived the right to bargain

over an issue that was never proposed." *Vincent Indus. Plastics v. NLRB*, 209 F.3d 727, 735 (D.C. Cir. 2000).

Vico's second argument is that its history of granting annual wage increases is not the type of term or condition that requires bargaining because the past wage increases did not follow any set formula or criteria. Vico maintains that this requires a dismissal for vagueness. Again, Vico's argument fails. The lack of an explicit formula for computing wage increases is not controlling. As we have held, "when an employer has established a regular wage-increase program with fixed criteria, even though discretionary in amount, that program cannot be discontinued unilaterally." *Daily News of Los Angeles v. NLRB*, 73 F.3d 406, 412 (D.C. Cir. 1996). The past wage increases here were not only regular but also consistent in criteria: Vico granted across-the-board increases equally to all employees. In addition, Vico alone was in possession of its data regarding the wage increases, and the General Counsel should not be faulted for Vico's failure to make this data known.

C.   Antiunion Animus

Under *Wright Line*, 251 NLRB 1083 (1980), the General Counsel must establish a *prima facie* case that protected conduct was a motivating factor in Vico's decision to layoff. The burden then shifts to Vico to demonstrate as an affirmative defense that the decisions would have been the same even in the absence of the protected conduct. 251 NLRB at 1084, n.5.

The Board's conclusion that Vico's relocation decision was based on antiunion animus rests on four main points: (1) statements made by Robert Schultz and Dearing in the presence of unit employees; (2) provisions in the loan documents that required Vico to acknowledge that equipment purchased with MSF funds were to remain in the Plymouth facility; (3) the June 27, 1997 meeting between Schultz and Keeling; and (4) the timing of Vico's leasing of space in Louisville in relation to the Union's certification.

Vico attempts to attack each of the points relied upon by the Board. Vico first attacks the Board's reliance on the statements of Robert Schultz and Dearing. Regarding Robert Schultz's statement, Vico contends that the statement itself is unreliable because it was made during working hours in a busy part of the facility that would have been very loud. Also, Vico argues that the statements carry no weight because Robert Schultz was inactive at the company at the time. Regarding Dearing's statements, Vico notes that Nitz, the employee to whom the alleged statements were made, testified that he was a five-year employee when he actually had been at the company for only seven months in his most recent stint. In addition, Vico points out that Nitz was in a part of the facility where hearing protection was required. Vico further notes that Dearing denies having made the comment, and states that Nitz's testimony was uncorroborated. These arguments fail. They are no more than challenges to credibility determinations. It is long past the time for such arguments. We do not retry the evidence. "[C]redibility of witnesses is a matter for Board determination, and not for this court." *Joy Silk Mills*, 185 F.2d 732, 741 (D.C. Cir. 1950). "[W]e do not reverse the Board's adoption of an ALJ's credibility determinations unless, unlike here, those determinations are 'hopelessly incredible,' 'self-contradictory,' or 'patently unsupportable.'" *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998).

Vico points out that the ALJ found that Dearing's statement was protected under section 8(c) of the NLRA, which protects an employer's non-coercive antiunion statements and prohibits the Board from inferring an unlawful motivation for employer actions from such statements. 29 U.S.C. § 158(c). *See B.E. & K. Constr. v. NLRB*, 133 F.3d 1372, 1376–77 (11th Cir. 1997). However, Dearing's statement, much like the statement of Robert Schultz, reasonably can be construed as evidence of antiunion motivation because it represented a threat ("changes . . . are going to be made when the Union is voted in and there may or may not be jobs left . . .") from an authoritative source within the company (the Company Comptroller & General Manager of Organizational Support). *Reno*

*Hilton Resorts v. NLRB*, 196 F.3d 1275, 1283 (D.C. Cir. 1999) ("[R]easonable inferences of anti-union motivation were virtually compelled by the statements of Reno Hilton officials . . . that the hotel would strongly consider contracting out . . . jobs if the Union prevailed in the election.").

Next, Vico argues that its actions relating to the MFS loan and Plymouth tax abatement did not indicate union animus. Vico notes that the Michigan Attorney General's Office believed Vico not in default. Vico adds that the only penalty for relocation is acceleration of a *pro rata* portion of the loan. Contrary to Vico's arguments, Vico's efforts to obtain the MSF loan and the Plymouth tax abatement do not square with the relocation decision. The sudden relocation marked a dramatic shift from Vico's prior statements made in connection with the loan and tax abatement that it intended to remain in Michigan.

Vico attacks the Board's reliance on the June 27, 1997 meeting in which Schultz failed to tell Keeling of Vico's impending relocation. Vico argues that Keeling's testimony is unreliable because his notes of the meeting include no notation that Schultz stated that Vico had no immediate plans of relocating. Further, Vico argues that Keeling's testimony was incredible and contradicted by Schultz's testimony that no discussion of relocation took place at the meeting. These credibility arguments fail for the same reason as the ones made previously by Vico.

Vico attempts to undercut the Board's reliance on the timing and circumstances of the relocation to Louisville. Vico argues that it introduced substantial evidence supporting its argument that its intent to relocate began before the Union petition. Vico contends that its evidence shows that the Louisville facility was intended for manufacturing rather than simply distribution; that the Blue Room was an inadequate space for production work; that Schultz explained to employees at the June 1996 meeting that the caliper-pin operations might be relocated to better serve customers as Vico had done previously in South Carolina; that the inventory build-up began before the Union's representation petition; and that Vico's cost-benefit analysis serves as an adequate basis for

Vico's relocation decision. In addition, Vico emphasizes the fact that none of the bargaining committee members were among the 33 employees laid off. Vico argues that all of this evidence prohibits a finding that the timing of the relocation decision tends to show union animus.

We find the haphazardness, the timing, and the secretive nature of the hasty relocation decision render the decision "suspicious." *NLRB v. United Mineral & Chemical Corp.*, 391 F.2d 829, 833 (2d Cir. 1968). Just a week-and-a-half before the move, Vico needed to lease a second facility in Louisville (Louisville Building B). And as of the morning of the move, Vico did not have a mover under contract to haul the equipment from Plymouth to Louisville.

The relocation occurred just three months after the Union election and took place with almost no planning and no notice to anyone, including Vico's key customers. Schultz's failure to inform Union Representative Keeling of the impending move when Keeling asked about it just a week prior to the move is especially suspicious and suggests that Schultz was hiding the relocation decision from the Union. Equally suspicious is Vico's failure to notify its primary customers, especially considering Vico's previous announcement to Ambrake of its new warehouse and distribution facility in Louisville. Vico failed to notify Ambrake (the customer whom Vico claims benefits most from the move) until two days before the relocation and without so much as a written plan for the move or engineering drawings of the new set-up. Ambrake's surprised and uneasy response casts further doubt on Vico's stated motives. Further, Schultz failed to recall whether he informed Bosch of the move despite the fact that the move appeared potentially to affect Bosch adversely because the move resulted in Vico being farther away from Bosch.

In an attempt to make its relocation decision appear as if it was made prior to union organization efforts, Vico contends that its build-up of inventory prior to the move to Louisville was an effort to help establish the facility as a manufacturing center as soon as it opened. However, the build-up of inventory just as easily supports the Board's view that Vico initially intended to establish the Louisville facility solely as a

distribution center. The Board's view is further supported by the announcement that Vico sent to Ambrake upon opening the Louisville facility, welcoming Ambrake to Vico's new "Warehouse & Distribution Center." All of the evidence, taken together, constitutes substantial evidence that the relocation decision was motivated by antiunion reasons. *Cf. Bandag, Inc. v. NLRB*, 583 F.2d 765 (5th Cir. 1978); *Carter & Sons Freightways*, 325 NLRB 433 (1998).

In an attempt to create an affirmative defense, Vico, relying on its aforementioned cost-benefit analysis, suggests that its relocation decision would have been the same even in the absence of union activity. As indicated above, this after-the-fact analysis cannot support Vico's decision to relocate and does nothing to undermine the Board's finding that the relocation decision was motivated by antiunion animus.

Finally, Vico argues that the Board erred in reversing the ALJ's decision that the relocation decision was not motivated by antiunion animus because the ALJ's decision was based upon credibility determinations of several witnesses. Vico argues that the Board is at a disadvantage regarding credibility determinations and that the ALJ's credibility determinations are "entitled to great weight." *Holyoke Visiting Nurses Ass'n v. NLRB*, 11 F.3d 302, 308 (1st Cir. 1993). However, the Board "is authorized to make findings contrary to the findings of the [ALJ], and where there is substantial evidence to support the Board's findings, the court may not set them aside merely because the Board's view of the weight and credibility of the witnesses differed from that of the [ALJ]." *Joy Silk Mills*, 185 F.2d at 742. And we are "even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is circumstantial." *Vincent Indus. Plastics*, 209 F.3d at 734. We will not disturb the Board's finding that Vico's relocation decision was based upon antiunion animus as this finding was supported amply by substantial evidence on the record as a whole.

D. Remedial Order

The Board "has wide discretion in ordering affirmative action" to fashion remedies for unfair labor practices. *Virgi-*

*nia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 539 (1943). Generally, we will affirm a Board remedial order unless the order is shown to be "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *O'Dovero v. NLRB*, 193 F.3d 532, 538 (D.C. Cir. 1999) (quotation omitted).

In the context of restoration orders, the Board's order will be set aside as contrary to law if it imposes an undue burden on the employer. *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964). In order to show that a Board order imposes an undue burden on an employer, courts have required that the employer demonstrate by a preponderance of the evidence that it faces a capital investment that is disproportionate to its resources or that it faces substantial and continuous losses. *O'Dovero v. NLRB*, 193 F.3d at 538.

Vico argues that the present case is comparable to *Coronet Foods, Inc. v. NLRB*, 158 F.3d 782 (4th Cir. 1998). In *Coronet*, the Fourth Circuit held that an employer did not need to restore its transportation department that it had closed in retaliation for union activities. The Fourth Circuit found that a restoration order would impose upon the employer an undue financial hardship. The court found that the ALJ had focused too narrowly, stating that evidence concerning "subsequent relevant economic ... factors" could be considered. *Id.* at 795. The court noted that the transportation department that the employer had shut down was "outmoded and inefficient" and that to require restoration would put the employer "at a competitive disadvantage within its industry." *Id.* at 796. Vico contends that this case is quite similar in that requiring restoration of the Plymouth facility and its Blue Room would put Vico at a competitive disadvantage by withholding the purported benefits of Vico's Louisville facility, such as a loss of increased business since the relocation.[2]

---

[2] Vico states that since its relocation to Louisville, its caliper-pin production has increased from 15,273,850 units in 1997 to 21,698,530 in 2002.

Vico adds that the Board's order neglects the costs Vico faces in moving back into the under-sized, inefficient Plymouth facility. Vico points to *NLRB v. G&T Terminal Packaging Co.*, 246 F.3d 103 (2d Cir. 2001), a case in which the court found a restoration order unduly burdensome to the employer. In that case, the Second Circuit addressed the issue of space constraints, noting that "nothing in the record contradicts the Company's claim that it simply does not have enough space to install a new machine in its . . . facility and, therefore, that reinstating the . . . operation is all but impossible." *Id.* at 121–22; *see also Garwin Corp.*, 153 NLRB 664 (1965); *Bonnie Lass Knitting Mills, Inc.*, 126 NLRB 1396 (1960) (restoration order unwarranted).

Last, Vico argues that *Fast Food Merchandisers, Inc.*, 291 NLRB 897 (1988), and *Litton Business Systems*, 286 NLRB 817 (1987), stand for the proposition that where a layoff decision is an effect of an earlier identifiable decision that is not a mandatory subject of bargaining, a restoration order is not an appropriate remedy. Vico contends that in this case the layoff decision was a result of the earlier decision to relocate and does not warrant a restoration order. Vico adds that the effect of the layoffs has been mitigated by Vico's offers of reinstatement (in reverse-seniority order) following settlement of the injunction proceeding.

We conclude that the Board's restoration order is within its broad discretion. Vico has not shown an undue burden by a preponderance of the evidence. Vico is not without a viable option. Vico has not shown evidence that it was operating at a loss in Plymouth. Nor has it offered any proof that it would lose business by moving back to Plymouth. Thus, its reliance on *Coronet* is misplaced. Likewise, *G&T Terminal* is distinguishable. Vico has not shown that it is without adequate space in Plymouth. The fact that Vico already has returned some machines to Plymouth following the injunction proceeding and has implemented cell configuration more effectively to utilize space there severely undercuts its argument "that reinstating the . . . operation is all but impossible." *G&T Terminal*, 246 F.3d at 121–22. Finally, Vico's argument that *Fast Food* and *Litton* stand for the proposition

that a restoration order is inappropriate where a layoff decision is the product of an earlier decision that is not a mandatory subject of bargaining completely misses the mark. Here, the underlying decision to relocate *is a mandatory subject of bargaining* (a point that Vico does not contest). *See supra* Part II.A.1.

## III

Each of the Board's findings is supported by substantial evidence on the record considered as a whole. First, substantial evidence supports the Board's finding that the relocation of the caliper-pin equipment was a mandatory subject of bargaining and that Vico therefore violated the Act when it relocated the caliper-pin facility, and the Board was correct in deciding that Vico unlawfully failed to engage in effects bargaining. Second, the Board was correct in finding that Vico acted unlawfully in unilaterally discontinuing its established practice of granting an annual across-the-board wage increase. Third, the Board's finding that Vico's decision to relocate was based upon antiunion animus was supported by substantial evidence, including statements made by management to employees, Vico's previous loan commitments, and the stealthy manner in which Vico conducted the relocation. Finally, we agree with the Board that it acted within its broad remedial authority in ordering Vico to return the caliper-pin operation to Plymouth and to reinstate the laid-off employees with back pay. Accordingly, we deny Vico's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*