# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 13, 2016        Decided August 12, 2016

No. 15-1010

CARE ONE AT MADISON AVENUE, LLC, DOING BUSINESS AS
CARE ONE AT MADISON AVENUE,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

1199 SEIU UNITED HEALTHCARE WORKERS EAST,
INTERVENOR

---

Consolidated with 15-1025

---

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

---

*Erin E. Murphy* argued the cause for petitioner. With her on the briefs were *Paul D. Clement*, *C. Harker Rhodes*, *IV*, and *Andrew N. Ferguson*.

*Milakshmi V. Rajapakse*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin*, *Jr.*, General Counsel,

*Jennifer Abruzzo*, Deputy General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Robert J. Englehart*, Supervisory Attorney, and *Douglas Callahan*, Attorney.

*Katherine H. Hansen* argued the cause for intervenor. With her on the brief was *William S. Massey*.

Before: ROGERS, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The National Labor Relations Board (the Board) determined that petitioner Care One at Madison Avenue (Care One or the Company) committed a series of unfair labor practices in an effort to prevent the certification of a union at its nursing home and rehabilitation facility in Morristown, New Jersey.  After the union lost a representation election in March 2012, it filed objections and charges of unfair labor practices with the Board.  The Board held that Care One had interfered with employees' protected activity and discriminated against union-eligible employees in violation of the National Labor Relations Act (the Act) by instituting a system-wide, discretionary benefits increase shortly before a scheduled representation election and denying the increase to the union-eligible employees.  The Board also concluded that the company unlawfully interfered with its employees' right to organize by distributing to employees eligible to vote in the upcoming election a threatening leaflet associating unionization with job loss; presenting a slideshow depicting employees, without their consent, as if they supported the Company's antiunion campaign; and issuing a post-election memorandum reiterating the company's workplace violence policy, which the Board concluded could reasonably be read in context to

threaten reprisal for protected union activity. *Care One at Madison Ave., LLC d/b/a Care One at Madison Ave. & 1199 SEIU, United Healthcare Workers E.*, 361 N.L.R.B. No. 159, 2014 WL 7339612 (Dec. 16, 2014).

We deny Care One's petition for review and grant the Board's cross-application for enforcement of its order on each of the charges.

## I. Background

The Company's Morristown, New Jersey, nursing home, Care One at Madison Avenue, is part of a network of approximately twenty nursing and rehabilitation facilities that Care One Management runs across the state. Employees at those facilities share a common health insurance plan. Effective January 1, 2012, Care One Management modified its company-wide plan, reducing benefits and increasing costs for its employees.

As Care One Management was eliminating benefits, employees at the Madison Avenue facility were organizing. On January 23, 2012, 1199 SEIU United Healthcare Workers East (the Union) filed a petition for an election to represent full-time and regular part-time non-professional employees at that location.

Meanwhile, Care One decided it would reverse cuts it had made to its health insurance plan, thereby restoring many benefits to their pre-2012 levels. The Company announced the restoration of benefits in a March 5, 2012, memorandum, just three weeks shy of the scheduled representation election, with the restoration to become effective the day of the election. Care One withheld the March 5 memorandum only from union-eligible employees without any explanation, and did not tell the excluded employees when or whether their

benefits would be restored. Care One facilities administrator George Arezzo, however, posted the memorandum at the Madison Avenue facility where union-eligible employees could—and did—see it. When the excluded employees asked Arezzo about the benefits, he refused to discuss the matter with them. The sole reason the Company offers for its targeted exclusion of the union-eligible employees is "the pendency of the representation election." J.A. 93, 187.

In the months leading up to the election, Care One campaigned against the Union. The Company distributed leaflets to the Union-eligible employees, which told them to "Get the Facts!" J.A. 98. One of those leaflets directed employees to "think about what you need to do when you vote" and listed a series of questions for employees to consider, including, "Do you want to give outsiders the power to jeopardize your job by putting you out on *strike*?" *Id.* (emphasis in original). The answer, the company emphasized in bold, oversized type, was "NO." *Id.*

On March 21, two days before the election, the Company held a mandatory meeting for all union-eligible employees. At the meeting, Arezzo made the Company's final argument against the Union. He told the employees that Care One was a "family" that would work better together without a union. J.A. 41. At the end of the meeting, Arezzo showed the employees a slideshow that reiterated the "we are family" theme. The slideshow included images of many of the union-eligible employees. Care One management had represented when it took the employees' photographs that they were for a Valentine's Day activity, a patient-care program, and a display case in the common space of the facility. Management never sought or received consent from employees to use their photographs in the antiunion campaign slideshow, nor did it make any disclaimer that the

presentation did not necessarily reflect the views of the employees depicted. In the slideshow, the images of employees were set against a recording of Sister Sledge singing "We are Family." When the slideshow concluded, Arezzo reportedly said to the employees, "Please vote no, give management a chance, we're a family, we're a team." J.A. 55.

When the Union held the election two days later, fifty-seven employees voted for union representation and fifty-eight voted against.

On March 26, three days after the election, Arezzo posted a memorandum entitled "Teamwork and Dignity and Respect" on the employee bulletin board. Arezzo's memorandum addressed the Madison Avenue facility's employees: "Now that the NLRB Election is behind us," he wrote, "I was hoping that everyone would put their differences behind them and pull together as a team." J.A. 124. Arezzo asserted in the memorandum that he had heard that "a few employees are not treating their fellow team members with respect and dignity" and noted "disturbing reports that some of our team members have been threatened." *Id*. He went on to say that "employees have a right to make up their own minds regarding the union" and that he "respect[ed] the right employees have to be for or against the union," *id*., but cautioned that those rights "do not give anyone the right to threaten or intimidate another team member, for any reason," *id*. Arezzo attached to the memorandum Care One's pre-existing Workplace Violence Prevention policy. There was in fact no evidence of any threats or intimidation, or even reports thereof, leaving employees to wonder what communications or activities surrounding the union representation election the management thought the referenced disciplinary policy encompassed.

The Union filed several objections to the unsuccessful election. The Board upheld most of those objections and ordered a new election. *Care One at Madison Avenue*, Case 22-RC-072946, 2012 WL 4049006 (N.L.R.B. Sept. 13, 2012). The Union also filed several unfair labor practice charges against Care One, prompting the Board's Acting General Counsel to bring the charges at issue in this case. The second representation election awaits the resolution of these unfair labor practice charges.

The parties waived an in-person hearing and instead submitted a stipulated record. Based on that record, an ALJ found that Care One's challenged antiunion conduct before and immediately following the representation election violated sections 8(a)(1) and 8(a)(3) of the Act. 29 U.S.C. § 158(a)(1) & (a)(3). In a December 16, 2014, Decision and Order, the Board upheld the ALJ's findings and conclusions, with the exception that Member Johnson dissented from the Board's holding that the post-election memorandum could reasonably be read as unlawfully threatening protected activity.

Care One petitioned this court for review of the Board's order, the Board cross-applied for enforcement, and the Union intervened in support of the Board. We have jurisdiction over the petition and application under sections 10(e) and 10(f) of the Act. 29 U.S.C. §§ 160(e), (f).

## II. Analysis

When workers begin to organize, their employer may take many steps to convince them not to form a union. But no employer has completely free rein. The National Labor Relations Act, interpreted in decades of precedent of the Board and the courts, strikes a balance between the prerogatives of employers and the rights of employees.

Because "the NLRB has the primary responsibility for developing and applying national labor policy," *NLRB v. Curtin Matheson Sci., Inc*., 494 U.S. 775, 786 (1990), we will "uphold the Board's legal determinations so long as they are neither arbitrary nor inconsistent with established law," *Tualatin Elec., Inc. v. NLRB*, 253 F.3d 714, 717 (D.C. Cir. 2001). On questions of fact, the Board's findings are "conclusive" if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951).

Applying those standards, we grant the Board's application for enforcement of its order.

### a. Pre-election Benefit Grant to All Except Union-Eligible Employees

An employer must refrain from interfering with or discouraging the exercise of protected labor rights by either granting or withholding a benefit. Whether interference is accomplished by dangling a carrot or brandishing a stick, the Supreme Court has long counseled that it is interference all the same. *See NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 32 (1967); *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409-10 (1964). What the Act requires is that the employer make its benefits decisions "precisely as it would if the union were not on the scene." *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 927 (D.C. Cir. 2005) (quoting *Perdue Farms, Inc. Cookin' Good Division v. NLRB*, 144 F.3d 830, 836 (D.C. Cir. 1998)). Section 7 of the NLRA protects a range of employee rights to form, join, and support labor unions and engage in bargaining and other concerted activities to advance their interests in the workplace. 29 U.S.C. § 157. An employer may not use benefit eligibility as a means of discouraging employees from participating in a representation

election.  *See* 29 U.S.C. § 158(a)(1).  And it may not, without valid reason, treat employees differently in the promise or offer of important employee benefits based on the employees' participation in protected activities.  *See* 29 U.S.C. § 158(a)(3).

When Care One timed the announcement of its discretionary, one-time, system-wide reinstatement of a valued healthcare benefit just three weeks before a scheduled representation election, withheld that benefit from only its union-eligible employees, and offered "the pendency of the representation election" as its sole reason, it violated the Act. The Company thereby discouraged union membership in violation of section 8(a)(1), and discriminated against union-eligible employees in regard to a term of employment, in violation of section 8(a)(3).

Substantial evidence supports the Board's conclusion that the way in which Care One reinstated the health plan unlawfully interfered with its employees' right to organize in violation of Section 8(a)(1).  As we have explained, "an employer may not withhold a wage increase that would have been granted but for a union organizing campaign." *Federated Logistics*, 400 F.3d at 927.  By the same token, "implementation of a benefit before a scheduled election, . . . without a showing of business justification, has itself been deemed evidence of improper motive."  *Pedro's, Inc. v. NLRB*, 652 F.2d 1005, 1009 n.11 (D.C. Cir. 1981).  Section 8(a)(1) prohibits an employer from conferring or withholding a benefit "with the express purpose of impinging upon [employees'] freedom of choice for or against unionization" where such action "is reasonably calculated to have that effect." *Exchange Parts*, 375 U.S. at 409.

The circumstances here are telling: Three weeks before the scheduled election, the Company decided to grant a system-wide benefit, but created a targeted exclusion of the union-eligible employees. And, according to the parties' Joint Stipulation of Facts, "[i]t was because of the pendency of the representation election" that the Employer excluded eligible voters from its March 5, 2012, notification to all other employees that "they would receive the improvements in the health insurance plan and that their employee contributions would be reduced on March 23, 2012." J.A. 93. There is thus no dispute that Care One would have extended the benefit to its union eligible employees were it not for their protected activity.

The particulars of the timing further support the Board's finding of unlawful motive. The Company had eliminated the benefits months earlier, and its decision to reinstate them was a one-time, wholly discretionary choice. Employees had been objecting to the benefits cut all along, yet Care One chose early March to announce its decision to restore them. There is no evidence that the timing was part of any regularly scheduled benefits open-season or annual renewal, for example; the record is devoid of any legitimate business rationale for the Company's chosen timing. That timing is particularly indefensible given that the Company awarded the benefits retroactive to January, meaning that waiting until March saved it no money, and making the announcement before rather than after the election did not ensure earlier coverage to its employees.

The timing and context, the exclusion of the union-eligible employees, and the admitted attention to the upcoming election provide substantial evidence to support the Board's determination that Care One unlawfully sought to

induce the employees to reject the union in violation of section 8(a)(1).

Substantial evidence also supports the Board's conclusion that, by discriminating with respect to a term of employment, Care One unlawfully discouraged union membership in violation of section 8(a)(3). A showing of a targeted withholding of a significant employee benefit only from those employees who are in the process of exercising or are about to exercise protected rights may, without more, "bear[] 'its own indicia of intent'" to discourage employee exercise of those rights. *See Great Dane*, 388 U.S. at 33 (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 228 (1963)). Where the Board has shown that the "employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent," the burden shifts to the employer "to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." *Id*. at 34 (emphasis in original). Because Care One has made no attempt to show that the exclusion of union-eligible employees from its system-wide restoration of benefits was motivated by any legitimate business objective, the Company failed to meet that burden.

Care One argues that its conduct cannot amount to an unfair labor practice because it was merely attempting to navigate in good faith what it views as the Board's "incoherent jurisprudence." Reply Br. of Petitioner 1. The Company insists that, had it included its union-eligible employees in the benefits increase, it would have risked a Board determination that it was seeking to buy the employees' votes with the improved benefits in violation of the Act as interpreted in *Exchange Parts*, 375 U.S. 405. The Board's decision in *Noah's New York Bagels*, 324 N.L.R.B. 266, 272 (1997), instructed the company to withhold the

benefits increase from the union-eligible employees, Care One argues, while the Board's decision in *In Re Noah's Bay Area Bagels, LLC*, 331 N.L.R.B. 188, 190-91 (2000), required that it grant them the increase. Care One vividly complains that the Board adheres to "Janus-faced" precedent—a "'damned if you do, damned if you don't' doctrine"—that puts the Company in an untenable position, Br. of Petitioner 26, 28, 32, and that all it was trying to do was to maintain the status quo, *id*. at 23.

In particular, Care One contends that the Board's "contradictory precedent" makes it impossible for employers to make benefits changes during the pendency of a representation election, *id*. at 22-23, but neither the Board's case law nor ours creates the quandary Care One describes. Contrary to Care One's contentions, the Act does not require a company facing a union election to freeze its operations. An employer may make regularly scheduled benefits changes if it does so without treating employees differently based on their participation in protected activities, and without any motive of inducing employees to vote against the union. *See Pedro's, Inc.*, 652 F.2d at 1008. And where its legitimate business purpose so directs, an employer may move ahead with even an unscheduled, discretionary benefits change in the pendency of a representation election; what it must avoid is doing so for the purpose of attempting to influence employees' votes. *See Exchange Parts*, 375 U.S. at 409. But where, as here, an employer, without any legitimate explanation, schedules a discretionary, one-time benefit restoration just before an election and excludes from the benefit only the union-eligible employees, that employer reasonably may be viewed as attempting to discourage eligible employees' support for the union. *See Perdue Farms*, 144 F.3d at 837.

It simply is not the case, as the Company argues, that the Board has applied a *per se* rule that granting or withholding a discretionary benefits increase once an election is scheduled violates the Act, irrespective of the employer's motive. In all cases, the question is whether the employer's benefit decision was made for legitimate business reasons or because of protected activity. Under established law, an employer facing a representation election may, for example, continue to implement a benefit it had previously planned to offer its employees before they began organizing. *See Pedro's, Inc.*, 652 F.2d at 1008. An employer may have a legitimate reason in some circumstances for conferring a company-wide benefit on its employees, including union-eligible employees, during the pendency of an election, in which case extending the benefit to union-eligible employees would not be a coercive offer in violation of the Act. *See, e.g.*, *Noah's Bay Area Bagels*, 331 N.L.R.B. at 190. There is, however, good reason for the Board's caution that the "more prudent course" is to not grant a discretionary benefits increase just before a union election. *Noah's New York Bagels*, 324 NLRB at 272. Where an employer lacks a legitimate business reason for giving a benefit in the run-up to an election, a brief delay until after the election is a simple way to guard against a finding that the employer timed the announcement of the benefit in an effort to influence employees' voting behavior.

The Company's only proffered justification for omitting the union-eligible employees from the benefit was its legally erroneous view that the Board's precedent so required. But reliance on "dubious legal advice" does not excuse an employer's discrimination. *See St. Francis Fed'n of Nurses & Health Prof'ls v. NLRB*, 729 F.2d 844, 852 (D.C. Cir. 1984); *800 River Rd. Operating Co. v. NLRB*, 784 F.3d 902, 910 n.5 (3d Cir. 2015). Unlike in *800 River Road*, where the Board had made no findings as to the employer's motivations,

784 F.2d at 907-08, the Board found here that the sole reason Care One withheld the benefit increase from the union-eligible employees and no others was to dissuade employees from voting for the union in the imminent election.

In view of the applicable legal principles and the record in its entirety, we hold that substantial evidence supports the Board's conclusion that Care One's announcement of its decision to selectively restore popular benefits was an effort to discourage union membership in violation of section 8(a)(1) and was discrimination against union-eligible employees in violation of section 8(a)(3).

### b.    Misleading Employer Leaflet

The record also contains substantial evidence to support the Board's conclusion that employees would reasonably understand as a threat in violation of section 8(a)(1) the leaflet's claim that the union could call a strike and "jeopardize your job."  Section 7 protects employees' rights to engage in concerted activity in the workplace, including their right to strike.  An employer violates section 8(a)(1)'s bar on interfering with employees' exercise of their section 7 rights when it makes "coercive statements that threaten employees with job loss or plant closure in retaliation for protected union activities." *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 544 (D.C. Cir. 2006).

Care One argues that its leaflet instructing employees that striking could "jeopardize [their] jobs" was accurate and therefore not a "threat of reprisal" prohibited by section 8(c). The Act recognizes an employer's prerogative to communicate to its employees "any of [the employer's] general views about unionism or any of [its] specific views about a particular union" only insofar as the communications do not contain a "threat of reprisal or force or promise of

benefit." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969) (quoting 29 U.S.C. § 158(c)); *see also Progressive Elec.*, 453 F.3d at 544. An employer's freedom to "make a prediction as to the precise effects" it expects unionization to have on the business and its employees is limited to predictions based on "objective fact[s]" about events beyond the employer's control, or a "management decision already arrived at" before the unionization effort. *Gissel Packing*, 395 U.S. at 618. Any such employer prediction must also be "consistent with the law." *Eagle Comtronics, Inc.*, 263 N.L.R.B. 515, 516 (1982). An employer may truthfully inform its employees of their rights and duties, and, in particular, is not required to "fully detail[] the protections" that a striking employee enjoys in the event of an economic strike. *Id.* at 516; *see Laidlaw Corp.*, 171 N.L.R.B. 1366, 1369-70 (1968).

Care One's leaflet violated those principles because it failed accurately to characterize the implications of a strike for employees' jobs. The leaflet said, "Do you want to give outsiders the power to jeopardize your job by putting you out on strike?" J.A. 183. The leaflet overstated the risks to workers on economic strike, who retain important job protections: If their jobs have not been filled by replacements, employees are entitled to full reinstatement immediately after a strike, or, if their positions have been filled, "upon the departure of replacements." *Laidlaw*, 171 N.L.R.B. at 1369-70. They "remain employees" even where "their positions are filled by permanent replacements" as long as the striking employees "unconditionally apply for reinstatement." *Id.* Striking employees are also entitled to retain their pre-strike seniority when they return to active status. *See, e.g.*, *Olin Mathieson Chem. Corp. v. NLRB*, 232 F.2d 158, 160 (4th Cir. 1956), *aff'd*, 352 U.S. 1020 (1957);

*Republic Steel Corp. v. NLRB*, 114 F.2d 820, 821 (3d Cir. 1940).

The Board's distinction here between Care One's legally inaccurate claim that striking employees risk loss of a *job* and the permissible explanation that striking employees risk loss of *job status* may seem picayune, but we do not gainsay the Board's judgment of the significance of that distinction to employees exercising their protected right to form a union. In prior cases, the Board has found that employer statements that informed employees that striking could jeopardize their "job status" were accurate, and thus lawful, but the Board underscored that an employee's "job status" is distinct from her "job." When the Board in *Rivers Bend*, 350 N.L.R.B. 184, 185 (2007), for example, held that the employer's statement that hiring striker replacements "puts each striker's continued job status in jeopardy" was not a threat of termination in violation of Section 8(a)(1), the Board specifically emphasized that the employer "did not say that replaced strikers would permanently lose their jobs." *Id.*; *see Novi American, Inc.*, 309 N.L.R.B. 544, 545-46 (1992).

The Board reasonably concluded that the Company's leaflet was not truthful and could reasonably be construed as threatening in its blanket statement that striking could cost employees their job. The Board accordingly was justified in determining that the leaflet violated employees' section 8(a)(1) rights.

c. Captive-Audience Meeting and Misleading Slideshow

Substantial evidence also supports the Board's conclusion that the Company's slideshow violated the Act. Care One's facilities administrator, George Arezzo, aired the slideshow at a mandatory, pre-election meeting for union-eligible employees. The slideshow cast many of those

employees as supportive of the company's antiunion message, even though the Company never verified the employees' views or obtained their consent to be so depicted.

Because employees have the right to organize and advocate organization, remain neutral, or support an employer's antiunion campaign, an employer may not attribute an antiunion slogan to its employees without obtaining the employees' freely given permission to do so. *See Allegheny Ludlum*, 333 N.L.R.B. 734, 744 (2001). In general, "an employer who has not solicited employees to participate in a campaign videotape" may "nevertheless use their images in the videotape without incurring Section 8(a)(1) liability" only if the video, when "viewed as a whole, does not convey the message that the employees depicted therein either support or oppose union representation." *Id*. at 743 (emphasis omitted). There is no "blanket requirement that employers must obtain employees' explicit consent before including their images in campaign videotapes." *Id*. at 744. But an employer may not without permission use an employee's image to impute to the employee an opinion about unionization.

This is not a case of an employer displaying employees' images without "indicat[ing] the position of the employees on the subject of unionization." *Id*. at 744. The slideshow included images of happy, union-eligible employees making heart signs and smiling together, accompanied by the song "We Are Family." *See* J.A. 189. Arezzo had repeatedly tied the refrain of that song—"we are family"—to the antiunion message he was promoting. *Id*. The Board concluded, based on substantial evidence, that the context, purpose, and message of the slideshow that Arezzo showed to Care One employees at the mandatory March 21 meeting implied that

the depicted employees opposed unionization—a depiction that interfered with those employees' section 7 rights.

Care One argues that the Board erred by looking only to whether the slideshow was "part of the employer's campaign," without specifically determining that the slideshow ascribed a pro-union view to employees. Br. of Petitioner 52 (quoting December 16, 2014, Decision & Order, J.A. 190). But the Board specifically rejected that argument. It compared Care One's slideshow to one in *Sony Corp.*, which the Board held would cause a viewer to "reasonably conclude that the laughing and smiling photographs of unit employees whose faces appear during the film . . . were meant to show support for the antiunion message of the film as a whole." J.A. 190 (citing *Sony Corp. of Am.*, 313 N.L.R.B. 420, 429 (1993)).

The ALJ's finding that "there was no explicit antiunion message" in the slideshow itself, J.A. 190, does not detract from the Board's determination that, in the context of Arezzo's pitch, the implicit antiunion message was unmistakable. The "we are family" slogan was pervasive in the slideshow, and Arezzo reiterated it afterwards and used it to underscore his antiunion message. *See id.* The Board found that "there were unambiguous 'vote no' messages communicated to employees both before and after" the slideshow was shown, and found that the slideshow formed part of "the Employer's crusade to encourage employees to vote against union representation." *Id.* The findings that Care One's slideshow attributed an antiunion message to the employees pictured are supported by substantial evidence.

d.   Memo on Peaceful and Respectful Employee Interaction

Finally, we hold that the Board's conclusion that the memorandum Arezzo posted three days after the union

election violated section 8(a)(1) is supported by substantial evidence. An employer "violates Section 8(a)(1) when it maintains a work rule that reasonably tends to chill employees in the exercise of their Section 7 rights." *Lutheran Heritage Village-Livonia*, 343 N.L.R.B. 646, 646 (2004). The parties agree that Care One's pre-existing Workplace Violence Prevention Policy (the Policy), and the memorandum Arezzo posted on March 26 attaching and referencing that policy, did not explicitly prohibit any protected employee activity. The question is whether Care One's memorandum reiterating the anti-violence policy was, in context, unlawful because "(1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights." *Id*. at 647. The Board found the memorandum unlawful for the first two reasons.

The Board concluded that a reasonable employee could read the memorandum to, in effect, expand the existing Workplace Violence Prevention Policy so that it would newly subject employees to discipline merely for failing to treat other people in the workplace with "dignity and respect" with regard to their stance on unionization. We find adequate record support for the Board's determination that the memo, read in context, could reasonably be understood as instituting a new policy of disciplining protected Section 7 activity.

We emphasize that an exhortation like Arezzo's urging employees to behave with "dignity and respect" would not be unlawful on its own, but for the unlawful implication the Board identified in Arezzo's linking that caution to the disciplinary policy and the referenced protected conduct. We also underscore that the underlying Policy itself has not been shown to be unlawful in any aspect. *Cf. Adtranz ABB*

*Daimler-Benz Transp., NA v. NLRB*, 253 F.3d 19, 25–28 (D.C. Cir. 2001). We have made clear that employers have the prerogative of "demanding employees comply with generally accepted notions of civility." *See id*. at 27. Nothing in our decision to sustain the Board's order here should be read to discourage employers from insisting that people treat one another with dignity and respect in the workplace.

Nevertheless, the Board had sufficient basis on which to conclude that a reasonable employee could understand the memorandum as not merely an entreaty to respectful behavior, but as a warning that Care One would discipline protected activity such as occurred during the "NLRB election." J.A. 175. In the context in which it was issued, Arezzo's memorandum was reasonably susceptible of that broader interpretation. The memorandum emphasized with explicit reference to the just-concluded election that the employees should "let go" of their differences and start treating one another with "dignity and respect," or risk being in violation of the attached Policy. J.A. 175-76. That Policy expresses Care One's commitment to "maintaining a safe, healthy and secure work environment, and preventing violence in the workplace." J.A. 176. It provides that "[a]cts or threats of violence, including intimidation, harassment and/or coercion" against anyone on the premises "will not be tolerated," and contemplates discipline "up to and including termination of employment and/or legal action as appropriate." *Id*.

The critical fact, as found by the Board, is that "there is no record evidence . . . that any threats actually occurred." J.A. 177. Given that nobody had engaged in the "violence, including intimidation, harassment and/or coercion" that the Policy targets, a reasonable employee might make sense of the otherwise baffling recirculation of that Policy as aimed at

something else. Indeed, the memorandum was explicit about its subject: the organizing campaign. Because the memo followed directly on the heels of that concededly peaceful—if vigorously debated and contested—campaign, a reasonable employee could understand Care One to be saying that taking a position in the workplace regarding union rights is "disrespectful," threatening, or harassing to co-workers in a way that could warrant invoking the disciplinary policy. That the memorandum on its face is not limited to *pro*-union activity is beside the point. Care One's violation was to respond to peaceful workplace controversy over unionization by reiterating its anti-harassment policy in a way that, in context, could reasonably be understood as extending that policy to protected activity.

We have made clear that it would be "simply preposterous" to bar an employer from imposing "a broad prophylactic rule against abusive and threatening language," *Adtranz*, 253 F.3d at 28, but the Board found that Care One went further. In a context devoid of any of the conduct the Policy legitimately addresses—threats of violence, intimidation, harassment or coercion—the Board had substantial evidence upon which to conclude that Arezzo's memorandum could reasonably be understood to presage application of the disciplinary policy to the protected activity to which Arezzo's memorandum explicitly referred.

\* \* \*

We therefore deny Care One's petition for review and grant the Board's cross-application for enforcement with respect to the unfair labor practices found by the Board.

*So ordered.*