Dissenting opinion filed by Circuit Judge TATEL.
GINSBURG, Senior Circuit Judge:
The National Labor Relations Board held that Arc Bridges, Inc. violated §§ 8(a)(3) and (1) of the National Labor Relations Act by failing to give a wage increase to represented .employees, with whom it was then bargaining, when it increased the wages of its nonunion employees. The Employer petitioned this court for review. Because we hold that substantial evidence did not support the Board’s findings, we grant the Employer’s petition for review, vacate the Board’s decision and order, and deny the Board’s cross-application for enforcement.
I. Background
The Employer is a nonprofit corporation that provides “assisted living programs, employment counseling, and related sup: port services for individuals with developmental disabilities.” Arc Bridges, Inc. v. NLRB, 662 F.3d 1235, 1236 (D.C. Cir. 2011). In November 2006 and February 2007, the Board certified the American Federation of Professionals (the Union) to represent Arc Bridges’ employees in two separate bargaining units, consisting respectively of a Day Services employee unit and Residential and Supported Living employee unit. Arc Bridges, Inc., 355 NLRB 1222, 1222 (2010).
The Board found the sequence of relevant events thereafter was as follows. In May 2007, supervisor Raymond Teso told a future employee, Teresa Pendleton, during her interview that “the Union would be gone in November.” Although he did not say so, November was the end of the one-year period following the Union’s certification, during which the Employer could “not withdraw recognition from the union and the Board [would] not entertain a petition contesting the union’s majority status,” Arc Bridges, Inc., 362 NLRB No. 56, slip op. at 2 & n.9 (Mar. 31, 2015), https://www.nlrb.gov/case/13-CA-044627.
In June, the Employer’s board of directors authorized management to give a three- percent increase in wages to all employees. 355 NLRB at 1228 (ALJ Op.). In July, however, before any raise had been announced, the Union demanded changes in health insurance and retirement benefits and a 50% increase in wages over three years. Id. at 1227. Shortly thereafter *195 the Employer provided the Union with its financial data indicating it had only $53,497 available to meet the Union’s demands. Id. at 1227-28.
In July or August, area manager Bonnie Gronendyke told an employee, Shirley Bullock, that Executive Director Kris Prohl “was going to give us a raise until we voted the Union in.” Id. at 1230. In August, Teso told Pendleton that the $56,000 the Employer had available to increase the employees’ wages was instead being used to pay (presumably labor) lawyers. Id. Also in August, the employees in both units “voted to authorize the Union to call a strike.” Id. at 1228.
In September, the Employer offered the Union a one-time bonus for all represented employees to be paid from “certain grant money” to come from an outside source. Id. The Union did not accept that offer and the grant eventually expired. Id. In October, the Employer gave a three percent wage increase to its nonunion employees, retroactive to July. Id. In the course of their bargaining at some time thereafter, the Employer offered the Union a one and half percent and later a two percent wage increase for represented employees. Id. at 1229.
In March 2008, no collective bargaining agreement having been reached,
[t]he union filed a charge with the Board claiming that Arc Bridges had violated § 8(a)(1), (3), and (5) of the Act by granting the [retroactive] wage increase only to non-union employees. The Regional Director issued a ... complaint focusing exclusively on the theory that Arc Bridges had violated § 8(a)(3).
662 F.3d at 1237.
The Administrative Law Judge dismissed the complaint after analyzing, under the burden-shifting framework of Wright Line & Lamoureux, 251 NLRB 1083 (1980), the Employer’s failure unilaterally to increase the wages of the represented employees at the same time it gave the others a raise. 355 NLRB at 1231-32 (ALJ Op.). The ALJ first concluded “the General Counsel has not sustained her burden of proof under Wright Line by proving by a preponderance of the evidence that the employees’ protected activity, was a motivating factor for [the Employer’s] withholding of the wage increase.” Id. at 1232. Second, the ALJ held that, even if the General Counsel had carried her burden, “the [Employer] has met .its Wright Line- burden of proof by demonstrating it would have taken the identical action for legitimate, nondiscriminatory reasons.” Id. In doing so, the ALJ determined that both the General Counsel’s and the Employer’s asserted rationales for the discriminatory wage increase were plausible: The employer could have “withheld the wage increase in order to punish and retaliate against the employees for bringing in the Union,” or it could have withheld the increase as a “legitimate bargaining strategy.” Id. The Board reversed the ALJ’s decision on the ground that annual wage increases, “if sufficient funds existed,” had become “an established condition of employment” for all employees, the denial of which was a violation of the Act. 662 F.3d at 1238 (quoting 355 NLRB at 1223).
The Employer sought review of the Board’s decision and this, court reversed, finding the Board had ignored “evidence contradicting the practice” of yearly wage increases and holding the sporadic history of the increases had not made them a “condition of employment.” Id. at 1240.
On remand, applying the Wright Line burden-shifting framework, a panel of the Board held the Employer’s decision not to increase the wages of the represented employees was a violation of §§ 8(a)(1) and *196 (3) of the Act because it was motivated by antiunion animus. 362 NLRB at 1. Member Miscimarra dissented. Id. at 6. The Employer again petitioned for review and the Board cross-applied for enforcement.
II. Analysis
This court “must uphold an order of the Board unless it rests upon a finding not supported by ‘substantial evidence’ ” on the record taken as a whole. S & F Mkt. St. Healthcare LLC v. NLRB, 570 F.3d 354, 358 (D.C. Cir. 2009). We give
substantial deference to the Board’s factual inferences from the record before it, and [wjhen the Board concludes that a violation of the Act has occurred, [the Court] must uphold that finding unless it has no rational basis or is unsupported by substantial evidence. It is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions.
HealthBridge Mgmt., LLC v. NLRB, 798 F.3d 1059, 1067 (D.C. Cir. 2015) (citations and internal quotation marks omitted) (alterations in original).
We do not defer, however, when the Board fails adequately to explain why it has rejected the arguments for a different understanding of the evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 496-97, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Allentown Mack Sales & Service, Inc. v. NLRB, 522 U.S. 359, 378-379, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (“When the Board purports to be engaged in simple factfinding, ... it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly . demands”).
Here, the Board held the Employer’s decision to raise the wages of the nonunion employees violated § 8(a)(3) and hence § 8(a)(1) of the Act.[1] 362 NLRB at 1. Under § 8(a)(3), it is “an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.” 29 U.S.C. § 158(a)(3). For a violation of § 8(a)(3) under the circumstances presented here, the Board must find the Employer’s discriminatory action was motivated by antiunion animus, an “intent[ ] to prejudice the employees’ position because of their membership in the union.” NLRB v. Brown, 380 U.S. 278, 286, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965).
The Board has long held:
Absent an unlawful motive, an employer is privileged to give wage increases to his unorganized employees, at a time when his other employees are seeking to bargain collectively through a statutory representative. Likewise, an employer is under no obligation under the Act to make such wage increases applicable to union members, in the face of collective bargaining negotiations on their behalf involving much higher stakes.
Shell Oil Co. (San Francisco, Cal.), 77 NLRB 1306, 1310 (1948). To assess whether there is an unlawful motive, the Board applies the Wright Line framework. First, the General Counsel of the Board “must make a prima facie showing sufficient to support the inference that protected [i.e., *197 union-related] conduct was a motivating factor behind the [discrimination].” Fort Dearborn, 827 F.3d at 1072 (first alteration in original) (citations and internal quotation marks omitted). If the General Counsel meets her burden, the employer can prevail by showing “it would have taken the same action in the absence of the unlawful motive.” Id.
Here we are called upon to determine whether substantial evidence supports the Board’s conclusion that the Employer was unlawfully motivated in October 2007 when, while engaged in collective bargaining with the Union, it gave a wage increase to its nonunion employees. The Board relied for its conclusion upon four findings; these findings do not, however, even in the aggregate, provide substantial evidence in support of the Board’s conclusion.
A. Gronendyke’s Remark to Bullock
First, the Board found Ms. Prohl “intended to give employees a 3-percent wage increase until they voted for the Union,” based upon a statement by area manager Gronendyke that Prohl “was going to give us a raise until we voted the Union in.” 362 NLRB at 2, 3. The Board failed, however, to explain why this remark is anything more than an accurate statement of the same bargaining strategy the Board held in Shell Oil was lawful. See Orval Kent Food Co., 278 NLRB 402, 403 (1986) (declining to infer an unlawful motivation from a manager’s remark attributing a decision not to give wage increases to represented employees for having brought in the union because such “remarks were merely a realistic statement of the effects of the bargaining obligation which the [Employer] incurred when the Union was certified to represent the ... employees”). The Board in its opinion and on appeal attempts to distinguish Orval Kent on the ground that the employer there also offered wage increases to the union during negotiations. 362 NLRB at 3 n.14. This factual difference is irrelevant, however, because the Board did not, in characterizing the manager’s remark as “merely a realistic statement,” rely at all upon the employer’s having offered a wage increase to the represented employees.
B. Gronendyke’s Remark to Bullock and Teso’s Remark to Pendleton
Second, the Board found the “[Employee’s managers essentially encouraged employees to blame the Union ... for Prohl’s decision to withhold the increase from them,” citing both Gronendyke’s innocuous remark above and a statement made in August 2007 by supervisor Teso that the $56,000 previously budgeted for a raise was instead being used to pay the Company’s lawyers. Id. at 3. The Employer contends that Teso’s statement merely describes the financial constraints it faced because it had to expend resources on collective bargaining. We agree.
The Board cites our opinion in Acme Die Casting, a Div. of Lovejoy Indus., Inc. v. NLRB, 26 F.3d 162 (D.C. Cir. 1994), to support its argument that statements blaming the union for the lack of a raise show antiunion animus. That case, however, does not suggest that a realistic statement of the employer’s financial situation, such as Teso’s, shows antiunion animus. In Acme, the employer entirely refused to bargain with the union and, after not providing the usual semi-annual wage increase, the president of the company told a group of prounion employees: “I told you guys not to bother with the Union because that was going to happen, no raise.” 26 F.3d at 163, 164. In contrast, Teso’s statement was made during ongoing bargaining and faults not the employees’ decision to unionize but the Employer’s increased costs, an unavoidable reality affecting its *198 resources. Perhaps the Board thinks employees do not understand that collective bargaining has costs in addition to benefits, but pointing that out is not an appeal to desert the Union. Cf. B.F. Goodrich Co., 195 NLRB 914, 915 n.4 (1972) (“Had the grant been accompanied by statements encouraging the employees to abandon collective representation in order to secure the benefit [given to nonunion employees] ... we would have clear evidence of unlawful 8(a)(3) motivation”).
The other cases the Board cites are similarly unhelpful. See Aluminum Casting & Eng’g Co., 328 NLRB 8, 9 (1999), aff'd in relevant part, 230 F.3d 286, 290 (7th Cir. 2000) (affirming § 8(a)(3) violation where employer discontinued its “established practice of granting annual across-the-board wage, increases at the time the Union began its organizing campaign”); Structural Finishing, Inc., 284 NLRB 981, 989, 1003 (1987) (holding employer violated § 8(a)(1), which does not require antiunion animus, by telling employees “the Union would not allow” raises); American Girl Place, 355 NLRB 479, 479, 487 (2010) (holding § 8(a)(1) violated where employer told employees it “suspended the process of considering a wage increase” because of the union). We note, further, that neither Gronendyke nor Teso suggested the represented employees could capture the wage increase if they abandoned the Union.
C. Prohl’s Stated Business Justifications
Neither, does the Board’s finding that two of the Employer’s business justifications for the discrimination were pretextual discharge the General Counsel’s burden of establishing antiunion animus. First, Prohl testified that unilaterally giving the represented employees, like the nonunion employees, a three percent wage increase in October 2007, when the Union was demanding a 20% raise immediately and 50% over three years, would have likely provoked a strike, which the union members had then recently authorized. 362 NLRB at 3. The Board found this justification was “undermined” by Prohl’s having several months later offered the Union a wage increase of less than three percent. Id. Second, the Board discounted Prohl’s claim that she gave a three percent wage increase to the nonunion employees in October, retroactive to July, in order to stem the high quit rate among unrepresented supervisors and managers. Id. at 3-4. The Board did not credit this justification because the wage increase was given to all nonunion employees, not just managers and supervisors. Id.
The Board failed adequately to explain why these two justifications, which are respectively a facially reasonable bargaining strategy and' a rational business decision, are indicative of antiunion animus. First, that the Employer later offered the Union a wage increase of one-and-a-half percent does nothing to support the inference that its October 2007 decision not to give the represented employees a three percent raise was motivated by antiunion animus; the Board offered nothing to the contrary except its conclusory statement that the later offer “undermined” Prohl’s assertion that at the earlier time she feared provoking a strike. This is a non sequitur. Why Prohl offered a raise of one-and-a-half percent in collective bargaining several months later, with no strike having been called, is not a matter of record. Board counsel simply failed to ask. Prohl what circumstances, if any, had changed by the later offer. Therefore, there is no basis for the Board’s conclusion that her later raise “undermined” her explanation for not offering a raise several months earlier. See Universal Camera, 340 U.S. at 488, 71 S.Ct. 456 (“The substantiality of evidence *199 must take into account whatever in the record fairly detracts from its weight”); see also 355 NLRB at 1232 (ALJ Op.) (concluding “it has not been shown that the [Employer’s] rationale for withholding the wage increase ... was advanced merely as a pretext to mask discriminatory behavior”).
Second, the decision to extend a wage increase to all nonunion employees as a way of addressing the high turnover among managers and supervisors does not support the Board’s inference that anti-union animus motivated the Employer’s not increasing the wages of the represented employees, about whose wages it was then bargaining with the Union. The implication of the Board’s reasoning is that the Employer would have been on solid ground if it had given the raise only to managers and supervisors — who comprised about 40% of the nonunion employees.[2] But the raise given to all nonunion employees was consistent with the Company’s history of raising wages, if at all, for rank and file employees, whenever it raised wages of managers and supervisors. The Board’s attempt to spin these innocuous facts into an unlawful attempt to discourage union membership is simply unreasonable.
An additional problem with the Board’s decision is its cursory treatment of the other justifications given by Prohl. See 362 NLRB at 4-5. She testified that if the Employer had offered a three percent wage increase in October, then it would have had nothing further to offer the Union. Id. at 8 n.7 (Dissenting Op.). The Board entirely failed to address why granting a three percent increase to represented employees would not have severely impaired the Employer’s bargaining position. See 362 NLRB at 4-5. On appeal, the Board still does not address the substance of this justification for the Employer’s conduct, although the Employer continues to press it.
Prohl offered a further explanation for her decision, as recounted by the ALJ: “Asked why she did not also grant the wage increase to the unit employees, Prohl testified that she was attempting to avoid a charge for ‘not good faith bargaining.’” 355 NLRB at 1228 (ALJ Op.); see NLRB v. Katz, 369 U.S. 736, 745, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (holding unilateral wage increase to represented employees violated § 8(a)(5) duty to bargain in good faith). The Board cannot dismiss these points without at least some cogent discussion of their merits. Here, however, the Board summarily dismissed Prohl’s concerns, stating that the Employer could have permissibly discriminated if only it had not harbored an unlawful motive or if it had sought the Union’s approval before giving represented employees a 'raise. 362 NLRB at 5 & n.18. The first possibility is now beside the point for, as we have seen, the Board’s reasons for saying the Employer’s motive was antiunion do not withstand scrutiny. As to the second possibility, the Board did not even address Prohl’s concerns regarding the ex ante uncertainty of asking for the Union’s approval. As Member Miscimarra put it: “if the Union rejected the offer, she feared it would ... provoke a strike, and if the Union accepted the offer, the [Employer] would lose bargaining leverage.” Id. at 8 n.7 (Dissenting Op.). Therefore, the Employer had no reason unilaterally to forgo its Shell Oil privi *200 lege by asking for the Union’s permission.[3]
D. Second Statement by Teso to Pen-dleton
Fourth, the Board found that, because the Employer generally gave wage increases, if at all, in July, its decision to give a raise to the nonunion employees in October, one month before the end of the certification year for the Union, indicated an unlawful motive for the delay. 362 NLRB at 4. For this, the Board relied upon Teso’s statement, when interviewing a prospective employee the previous May, that “the Union would be gone in November.” Id. Teso’s May statement, however, was made before the Employer’s board of directors authorized a three percent wage increase (June) and before the Union presented its wage demands (July). The Board’s proffered connection between Teso’s May expectation that the Union would be gone after its first year and a finding of antiunion animus when the Employer five months later exercised its Shell Oil right is untenable, particularly in light of the ALJ’s finding that Teso’s statement “simply indicates that he believed no contract would be negotiated.” 355 NLRB at 1232 n.14 (ALJ Op.).
Of course “[t]he Board is free to disagree with the ALJ,” but under our ease law it must “explain the basis of its disagreement.” Fort Dearborn, 827 F.3d at 1073. Here the Board did not give a rational explanation for rejecting the ALJ’s conclusion. As Member Miseimarra pointed out and the Employer here emphasizes, for Teso’s statement to reflect the Company’s antiunion animus when it later withheld the wage increase from represented employees, the Board would have to find that Teso knew or foresaw in May that the Employer would refuse to increase the wages of represented employees in October. See 362 NLRB at 11 (Dissenting Op.). The Board did not so find and the record would not support it.
III. Conclusion
Viewing the Board’d four findings against the background of ongoing bargaining between the Employer and the Union, we hold substantial evidence does not support the Board’s inference that antiunion animus motivated the Employer’s decision not to give a unilateral wage increase to the represented employees in October 2007. Therefore, we grant the Employer’s petition for review, vacate the *201 Board’s decision and order, and deny the Board’s cross-application for enforcement.

So ordered.

. "[A] violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1),” Fort Dearborn Co. v. NLRB, 827 F.3d 1067, 1072 (D.C. Cir. 2016) (quoting Metro. Edison Co. v. NLRB, 460 U.S. 693, 698 n.4, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983)). Because the Board did not indicate the Employer committed an independent violation of § 8(a)(1), we address only § 8(a)(3).

. See 355 NLRB at 1227 (ALJ Op.) ("Approximately 121 individuals ... are not represented by the Union; of this number approximately 70 [58%] to 80 [66%] individuals are not managers or supervisors”).

. This court's recent opinion in Care One at Madison Ave., LLC v. NLRB, 832 F.3d 351 (D.C. Cir. 2016), does not support a different conclusion. In that case, we held the timing of a discriminatory increase in health benefits three weeks before a scheduled union election was probative of antiunion animus. Id. at 359. The employer was not, we said, in a no-win position when deciding whether to "make benefits changes during the pendency of a representation election,” id. at 359, because "a brief delay until after the election is a simple way to guard against a finding that the employer timed the announcement of the benefit in an effort to influence employees’ voting behavior,” id. at 360. Here, the represented employees were in the midst of bargaining and there is no hint in the record of another election in the offing. Therefore, the employer did not have the option of simply waiting "until after the election.” Id.
Care One does not apply here for an additional reason. The Employer’s discrimination occurred during the course of negotiations over wages. This difference is significant because the legal standards that apply to discrimination before and after an election are different. The Shell Oil privilege to grant benefits to nonunion employees absent antiunion animus does not apply pre-election; on the contrary, the Board "presumes” "the granting of benefits during an organizational campaign to be ... objectionable 'unless the Employer establishes that the timing of the action was governed by factors other than the pen-dency of the election.’ ” Noah’s N.Y. Bagels, Inc., 324 NLRB 266, 272 (1997).