TATEL, Circuit Judge,
dissenting:
Over eighty years ago, Congress passed the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-69, to level an uneven playing field for American workers by “allowing [them] to band together in confronting an employer regarding the terms and conditions of their employment,” NLRB v. City Disposal Systems Inc., 465 U.S. 822, 835, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). Intending to “do more than simply ... alter the then-prevailing substantive law,” Congress “restructure[d] fundamentally the processes for effectuating [labor] policy, deliberately placing the responsibility for applying and developing this comprehensive legal system in the hands of an expert administrative' body rather than the federalized judicial system.” Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge, 403 U.S. 274, 288, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). Thus, the National Labor Relations Board was born.
Now, as at the Board’s inception, its members are nominated by the President and confirmed by the Senate because of their expertise in labor policy. And now, as then, these members possess accumulated wisdom about the nuances of labor disputes due to their workaday experience enforcing the Act. Cf. Humphrey’s Executor v. United States, 295 U.S. 602, 625, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (characterizing independent agencies as “bod[ies] of experts who shall gain experience by length of service”). In short, Congress continues to “entrustf] the administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience.” San Diego Building Trades Council, Millmen’s Union, Local 2020 v. Garmon, 359 U.S. 236, 242, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).
In stark contrast to the Board, the federal courts, composed of generalist judges, have no comparable expertise, experience, or accountability when it comes to labor matters. For this reason, once a reviewing court concludes that the Board is operating within its delegated authority, it affords the Board great leeway. Waterbury Hotel Management, LLC v. NLRB, 314 F.3d 645, 650 (D.C. Cir. 2003) (“As we often observe, our role in reviewing decisions of the [Board] is limited.”). Courts may set aside Board findings “only when the record is so compelling that no reasonable factfinder could fail to find to the contrary,” Ozburn-Hessey Logistics, LLC v. NLRB, 833 F.3d 210, 217 (D.C. Cir. 2016) (quoting Bally’s Park Place, Inc. v. NLRB, 646 F.3d 929, 935 (D.C. Cir. 2011)), and “owe ‘substantial deference’ to inferences drawn by the Board from the factual record,” Tenneco Automotive, Inc. v. NLRB, 716 F.3d 640, 647 (D.C. Cir. 2013) (quoting Halle Enterprises, Inc. v. NLRB, 247 F.3d 268, 271 (D.C. Cir. 2001)). Further — and central to this case— “[o]ur review of the Board’s conclusions as to discriminatory motive is even more deferential, ‘because most evidence of motive is circumstantial.’ ” Fort Dearborn Co. v. NLRB, 827 F.3d 1067, 1072 (D.C. Cir. 2016) (quoting Inova Health System v. NLRB, 795 F.3d 68, 80 (D.C. Cir. 2015)). Together, these principles ensure that reviewing courts do not substitute their views of labor policy for those of the Board. Because the NLRB “has the primary responsibility for developing and applying national labor policy,” we and the Supreme Court have “accorded [the] Board ... considerable deference.” NLRB *202 v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 786, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990):
In the case before us, the Board had the difficult task of “applying the Act’s general prohibitory language” to a unique “combinationf ] of events” that allegedly violated the Act. Id. (quoting Beth Israel Hospital v. NLRB, 437 U.S. 483, 500-01, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978)). By contrast, this court has a far simpler assignment: determining whether the Board’s conclusions are supported by “substantial evidence.” See 29 U.S.C. § 160(e). In concluding that they were not, the court micromanages the Board, second guessing its factual findings and evidentiary inferences. Although the court sets forth one plausible interpretation of the record, the Board adopted another. I respectfully dissent, not because this decade-old labor dispute involving a small nonprofit in Indiana is especially important, but rather because it is important that reviewing courts refrain from resolving labor issues that Congress reserved for the Board.
I.
Under the Shell Oil rule, an employer collectively bargaining with a union may give unrepresented employees a benefit while withholding that benefit from represented employees. Shell Oil Co., 77 NLRB 1306, 1310 (1948). The court accuses the Board of ignoring this rule in'finding that Arc Bridges violated the Act by refusing to give represented employees a 3% raise. See Maj. Op. at 197. Quite to the contrary, the Board readily acknowledged the Shell Oil rule, Arc Bridges, Inc. & American Federation of Professionals, 362 NLRB No. 56, at 3 (2015) (citing Shell Oil, 77 NLRB at 1310), but simply pointed out— in accordance with its and our caselaw— that the rule comes with an exception: under NLRA section 8(a)(3), an employer engaging in collective bargaining may not treat represented and unrepresented employees differently on the basis of anti-union animus. See id.; see also Acme Die Casting v. NLRB, 26 F.3d 162, 166 (D.C. Cir. 1994) (“[T]he failure to increase [represented employees’] wages ... constituted a § 8(a)(3) violation if [the employer’s] decision was motivated by anti-union animus .... ” (emphasis omitted)).
The question in this case, then, is whether Arc Bridges withheld a 3% raise from represented employees due. to antiunion animus. To answer that question, the Board applied the two-part Wright Line test, and because that test boils down to finding facts and drawing inferences of animus, our deference to the Board is at its apex. See Vincent Industrial Plastics, Inc. v. NLRB, 209 F.3d 727, 734 (D.C. Cir. 2000) (“We are even more deferential when reviewing the Board’s conclusions regarding discriminatory motive, because most evidence of motive is circumstantial.”). Arc Bridges challenges neither Wright Line’s, applicability nor our highly deferential standard of review. Rather, it simply disputes the Board’s interpretation of record evidence.
In finding that the General Counsel had satisfied its Wright Line burden of showing animus, the Board relied on three pieces of evidence.
First, the ALJ and' Board both found that Area Manager Gronendyke told employee Bullock that “Prohl was going to give [represented employees] a raise until [they] voted the Union in,” and that Supervisor Teso told employee Pendleton “that $56,000 that had been' budgeted for the represented employees now had to go pay for the lawyers.” Arc Bridges, 362 NLRB No. 56, at 4 (internal quotation marks omitted). These statements, the Board de--termined, “essentially encouraged employ *203 ees to blame the Union -... for Prohl’s decision to withhold the increase from them.” Id. This conclusion is consistent with the Board’s longstanding view that where a grant of benefits to unrepresented employees is “accompanied by statements encouraging the [represented] employees to abandon collective representation in order to secure the benefit, ... [there is] clear evidence of unlawful [§ ] 8(a)(3) motivation.” The B.F. Goodrich Co., 195 NLRB 914, 915 n.4 (1972). Common sense underlies this expert judgment: if your supervisor told you that you would be getting a raise but for your union involvement, might you feel that your supervisor was tacitly encouraging you to abandon the union?
Unlike the Board, the court views Gro-nendyke’s and Teso’s statements as mere descriptions of Arc Bridges’ “bargaining strategy” and “financial constraints.” Maj. Op. at 197. And without explanation, it asserts that Teso’s statement cannot be read as “an appeal to desert the Union.” Id. at 197-98; see also id. at 198 (claiming, without explanation, that neither Gronen-dyke’s nor Teso’s statement even “suggest[s]” that “represented employees could capture the wage increase if they abandoned the Union”). Although the court’s interpretation of the record is plausible, our job under the NLRA is not to determine, in the first instance, the most likely import of employer statements. Instead, and contrary to the court’s approach, we must determine only whether the record is “so compelling that no reasonable factfin-der” could agree with the Board. Ozburn-Hessey, 833 F.3d at 217 (quoting Bally’s Park Place, 646 F.3d at 935). As discussed, Congress chose this allocation of authority because of the Board’s “specialized knowledge and cumulative experience” in discerning the subtext of employer statements, Garmon, 359 U.S. at 242, 79 S.Ct. 773—attributes we judges lack.
Next, the Board gleaned animus from two justifications that Prohl proffered for providing the 3% raise only to unrepresented employees, both of which the Board found pretextual. We have long held that “[a] finding of pretext may support an inference of unlawful motive,” Fort Dearborn, 827 F.3d at 1075, and here both of the Board’s pretext findings were well founded.
To begin with, the Board deemed pre-textual Prohl’s testimony that “she believed that granting the represented employees a 3-percent increase would have made the employees very unhappy and more likely to strike.” Arc Bridges, 362 NLRB No. 56, at 4 (internal quotation marks omitted). This pretext finding was reasonable given that, as the Board explained, Prohl later offered represented employees a 1.5% raise — a raise even lower than the one she claimed was so low that it would have upset those same employees. Id.
Quibbling with the Board’s analysis, the court suggests that Prohl may have deemed a strike more likely in October, when she withheld the 3% raise, than in March, when she offered the 1.5% raise. See Maj. Op. at 198-99. This hypothesis is belied by the record. For one thing, the ALJ found that “in October, at the time the wage increase was granted to the nonunit individuals, Prohl was no longer concerned that the granting of the wage increase to the unit employees would precipitate a strike.” Arc Bridges & American Federation of Professionals, No. 13-CA-44627, 2008 WL 5521196 (2008). For another, no record evidence suggests that a strike risk — if one ever existed — was any different in March than in October. Indeed, in explaining why she later offered the 1.5% raise, Prohl never even mentioned a diminished strike risk. This *204 court is obligated to respect the Board’s reasonable pretext finding, rather than adopt an employer’s justification that the ALJ rejected or one altogether missing from the record.
The Board also found pretextual “Prohl’s additional claim that she provided the wage increase to unrepresented personnel in order to address the high turnover rate among managers and supervisors.” Are Bridges, 362 NLRB No. 56, at 4. Substantial evidence supports this pretext determination because if one takes Prohl’s “high turnover” justification at face value, the scope of the raise would be both overinclusive and underinclusive. It would be overinclusive because Prohl granted the raise to all unrepresented personnel, even though the high turnover rate afflicted only managers and supervisors; it would be underinclusive because turnover among represented employees rivaled that of managers and supervisors (34% vs. 40%), and yet Arc Bridges gave represented employees no raise.
The court dismisses this analysis as “simply unreasonable.” Maj. Op. at 199. According to the court, giving a raise to all unrepresented employees, rather than just to managers and supervisors, tracked Arc Bridges’ “history of raising wages, if at all, for rank and file employees, whenever it raised wages of managers and supervisors.” Id. at 199. But that is not the explanation Prohl actually gave. Without mentioning past practice, Prohl pointed to “high turnover” among managers and supervisors. And given that this “high turnover” justification is riddled with holes, the Board reasonably inferred that it smacks of pretext. See, e.g., Pioneer Hotel, Inc. v. NLRB, 182 F.3d 939, 947 (D.C. Cir. 1999) (employer’s faulty justification was “pre-textual and intended to conceal [its] true motive”).
Finally, the Board found that the suspicious timing of the raise to unrepresented employees evinced antiunion animus. Specifically, the Board reasoned, Prohl waited until October to give the raise, even though she got the green light from the Board of Directors in June and customarily granted raises in July. October falls just before November, which is when the day-services unit’s certification year was set to end. And once a union’s certification year ends, “an employer may withdraw recognition [from the union] based upon actual evidence [e.g., a petition] that a majority of [unit] employees no longer supports] the union.” Chelsea Industries v. NLRB, 285 F.3d 1073, 1075 (D.C. Cir. 2002). All of this allowed the Board to make a fairly obvious inference: by dangling a carrot in front of day-services unit employees just a month before a potential decertification petition, Arc Bridges sought to sway those employees to vote against the union when the time came. In essence, Prohl was saying to day-services unit employees, “look what you can have if you vote against the union.”
Given the logical force behind Board inferences of animus based on suspiciously timed, targeted grants of benefits, we regularly decline to second guess them. For example, in Care One at Madison Avenue, LLC v. NLRB, 832 F.3d 351 (D.C. Cir. 2016), we held that “[w]hen [an employer] timed the announcement of its discretionary, one-time, system-wide ... benefit just three weeks before a scheduled representation election, withheld that benefit from only its union-eligible employees, and offered ‘the pendency of the representation election’ as its sole reason, it violated [§ 8(a)(3) ].” Id. at 357. True, in that case a union election had already been scheduled when the employer granted the benefit to unrepresented employees. Maj. Op. at 200 n.3. But the Care One rule sweeps broadly, applying whether or not an election has *205 been officially marked on the calendar. Without caveat, we said there that “[a]n employer must refrain from interfering with or discouraging the exercise of protected labor rights by either granting or withholding a benefit.” Care One at Madison Avenue, 832 F.3d at 357.
In sum, the Board reasonably found that the General Counsel carried its threshold burden of establishing that antiunion bias motivated Arc Bridges’ refusal to extend a 3% raise to represented employees. Two antiunion statements by supervisors, two pretextual justifications by the Executive Director, and a suspiciously timed raise to unrepresented employees amount to more than enough evidence under Wright Line. Given the deference we owe the Board, this court has no basis for reaching the opposite conclusion.
II.
Under Wright Line, once the General Counsel has established its prima facie case, the burden, as Arc Bridges acknowledges, shifts to the employer to show that it would have taken the same action absent antiunion animus. Fort Dearborn, 827 F.3d at 1072. Here, the Board concluded that Are Bridges failed to meet its rebuttal burden because two of the reasons Prohl offered for her decision were pretextual and the other two not credible.
As detailed above, the Board reasonably found pretextual Prohl’s testimony that she sought to avoid making represented employees “very unhappy” and aimed to quell a “high turnover rate” among managers and supervisors. As for Prohl’s additional justifications, she allegedly refrained from granting represented employees a 3% raise in order to prevent a loss of bargaining leverage and avoid a section 8(a)(5) violation. But as the Board noted, the ALJ never credited this portion of Prohl’s testimony and “at no point ... [found] those facts to be true.” Arc Bridges, 362 NLRB No. 56, at 6. Given the absence of an ALJ credibility finding, the Board quite properly lent no credence to these justifications and thus found that Arc Bridges failed to demonstrate a nondiscriminatory reason for its action. Id. Because “[c]redibility of' witnesses is a matter for Board determination, and not for this court,” Vico Products Co. v. NLRB, 333 F.3d 198, 209 (D.C. Cir. 2003) (quoting Joy Silk Mills v. NLRB, 185 F.2d 732, 741 (D.C. Cir. 1950)), the court was obligated to defer to the Board on this score.
My colleagues are troubled by the Board’s “fail[ure] to address why granting a three percent increase to represented employees would not have severely impaired the Employer’s bargaining position.” Maj. Op. at 199. Yet after finding— in line with the ALJ’s decision — that this justification lacked credibility, the Board had no reason to consider it.
Echoing the dissenting Board member, the court believes that Prohl legitimately withheld the raise to avoid a section 8(a)(5) violation. Id. at 199. This contention implies that Arc Bridges faced a no-win situation: violate section 8(a)(3) by withholding the raise or section 8(a)(5) by granting it. The Board considered and properly rejected this argument. Arc Bridges ran afoul of section 8(a)(3) not merely because it withheld the raise from represented employees, but because it did so due to antiunion animus. What is more, as the Board noted, Arc Bridges had a simple way to give represented employees a raise without flouting section 8(a)(5): seek the Union’s permission to do so. See Arc Bridges, 362 NLRB No. 56, at 6 n.18; see also NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (confining holding to “unilateral change[s] in conditions of employment under negotiation”); accord *206 Honeywell International, Inc. v. NLRB, 253 F.3d 125, 131 (D.C. Cir. 2001). The court says that asking for such permission may have provoked a strike, Maj. Op. at 199, but as the ALJ expressly found, there was no risk of a strike in October, see supra p. 203-04. The cateh-22 the court envisions is thus illusory. Cf. Care One at Madison Avenue, 832 F.3d at 359-60 (rejecting similar purported catch-22).